**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
www.flsb.uscourts.gov

In re:                                                     Chapter 7

GENEREX BIOTECHNOLOGY CORP,                 Case No. 22-13166-PDR

       Debtor.

_____/

**TRUSTEE'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING STALKING HORSE BID AND STALKING HORSE EPA, (II) APPROVING BID PROCEDURES AND BID PROTECTIONS IN CONNECTION WITH THE SALE OF DEBTOR'S EQUITY IN TWO SUBSIDIARIES, (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE, (IV) SCHEDULING AN AUCTION AND SALE HEARING AND (V) APPROVING THE SALE OF THE EQUITY FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

Marc Barmat, Chapter 7 Trustee ("Trustee") of Generex Biotechnology Corp. (the "Debtor") hereby files this motion (the "Motion") and moves the Court for an order (I) approving Stalking Horse Bid and Stalking Horse EPA, (II) approving bid procedures and bid protections in connection with the sale of Debtor's equity in two entities, including injunctive relief to preclude transfer or issuance of additional equity, (III) approving the form and manner of notice of sale, (IV) scheduling an auction and sale hearing, and (V) approving the sale of the equity free and clear of all liens, claims, encumbrances, and interests of any kind, including without limitation any right anyone may have to the Equity (as defined below), specifically including any right to claw back equity pursuant to contract or other restrictions on transfer, except that any buyer will take the Creek Olaregen Equity, as defined herein, subject to any valid lien asserted by Creek Mountain Partners, Inc.  In support of this Motion, the Trustee states as follows:

**SUMMARY OF PROPOSED SALE AND REQUESTED SALE PROCEDURES**

By the Stalking Horse Bid, the buyer, Bio & Med Tech of the Future SPV2, LP agrees to purchase 64,153,151 common stock shares of Antigen Express, Inc. d/b/a NuGenerex Immuno-

Oncology, Inc. and 100% of the shares of Olaregen Therapeutix, Inc. that are owned by Debtor for the price of $1,5000,000, subject to better or higher bids of at least $1,700,000 or more, submitted no later than **December 23, 2022 at 5 p.m.** The proposed sale of equity will be free and clear of all liens, claims, and encumbrances, except with respect to the lien of Creek Mountain Partners, Inc. on certain shares of Olaregen, to the extent it is a valid and enforceable lien. The proposed Stalking Horse Bid was reached after weeks of arms' length negotiations with multiple interested parties, and contains protections for the stalking horse bidder of a breakup fee of $50,000. In connection with the sale, the Trustee will seek findings, based on Debtor's records and public filings with the SEC, that the Debtor owns the equity sold, the absence of other equity classes in the entities whose stock is being sold, that the stalking horse bidder is a good faith purchaser, and that no other third party has any rights, interest, or equity in or to the shares sold. Notice of the requested sale procedures herein will be served all scheduled creditors, all creditors who have filed a proof of claim, and all other potential bidders who have expressed interest in the purchase, and the Trustee will publish notice of the sale in the Wall Street Journal. The deadline to object to the proposed sale and bid procedures herein is **December 16, 2022**, with the auction of qualifying bidders occurring on **December 27, 2022**.

## BACKGROUND

1.      On April 23, 2022 ("Petition Date"), Three Brothers Trading, LLC, GS Capital Partners, LLC, BHP Capital NY, Inc., Beijing Youfeng Biological Technology Co., Ltd. and Bedford Capital Group LLC ("Original Petitioning Creditors") filed an involuntary petition as to Generex Biotechnology Corp ("Debtor") for relief under title 11 of the United States Code commencing this case. (ECF 1.)

2.     The Debtor owns (a) 64,153,151 common stock shares and 100,000 shares of Series A Super Voting Preferred Stock in Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology ("NGIO") and (b) 100% of the equity in Olaregen Therapeutix, Inc. ("Olaregen").

3.     The Trustee has entered into an Equity Purchase Agreement with Bio & Med Tech of the Future SPV2, LP or its designee or successor or assigns (the "Stalking Horse Bidder") for the sale of all outstanding shares, equity, ownership interests, rights, and interests in property of Debtor in NGIO and Olaregen (collectively, the "Equity").  The purchase price is One Million Five Hundred Thousand Dollars ($1,500,000.00).  The sale will be subject to higher or otherwise better offers of at least $1,700,000.  The Trustee submits that the sale of the Equity to the Stalking Horse Bidder, or the highest and best bidder following an auction pursuant to Court approved bidding procedures, is in the best interests of the estate.

4.     The Trustee believes the best way to maximize the value of the Equity for the benefit of the Estate is through an auction sale.  The Trustee solicited eight prospective brokers for potential engagement in this bankruptcy case, and issues precluding retention were (1) the expedited timeline to market and sell the equity, and (2) the upfront retainer solicited by the brokers.

## EQUITY PURCHASE AGREEMENT

5.     On October 13, 2022, the Trustee entered into the EPA with the Stalking Horse Bidder, a copy of which is attached as **Exhibit 1**.  Key terms of the EPA are summarized below. The following is only a summary of certain material terms set forth in the EPA, and to the extent there are any inconsistencies, the executed EPA controls:

     i.     "Equity" shall mean all shares, common and preferred, voting and non-voting, and rights and property interests of Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology, Inc. and Olaregen Therapeutix, Inc. that are owned by Debtor

ii. <u>Bankruptcy Court Approval</u>. The Parties acknowledge and agree that this Agreement is not binding and cannot be performed by or enforced against Seller or Buyer unless and until the Bankruptcy Court approves this Agreement and authorizes Seller's performance of this Agreement.  If the Agreement is not approved by the Court, the Seller's obligation to sell the Equity to the Buyer shall terminate without any further liability or obligation on the part of any Party, and this Agreement shall terminate without any party having any further liability or obligation hereunder, except for Seller's obligation to refund the First and Second Deposits to the Buyer.

iii. <u>Acquisition</u>. Upon the terms and subject to the conditions contained in this Agreement, on the Closing Date (as hereinafter defined) the Seller, in his capacity as the Trustee, shall sell, convey, transfer, deliver and assign to the Buyer, and the Buyer shall purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the Equity free and clear of all Liens and Interests on an "as-is, where-is" basis, with no warranties or representations except as set forth herein, except that the Creek Olaregen Equity shall be taken subject to assumption of any valid lien asserted by Creek Mountain Partners, Inc. The purchase and sale of the Equity is referred to in this Agreement as the "Acquisition."

iv. <u>Purchase Price</u>. As consideration for the Acquisition, the total purchase price ("Purchase Price") shall be One Million Five Hundred Thousand Dollars ($1,500,000.00). The Purchase Price shall be paid by the Buyer to the Seller in cash or immediately available funds as follows:

(1)    Buyer shall pay Seller Seventy-Five Thousand Dollars ($75,000.00) within fourteen (14) days of the full execution of this Agreement (the "First Deposit").  The Deposit will be held in escrow by the Trustee and shall be released only as provided by this Agreement;

(2)    Buyer shall pay Seller Seventy-Five Thousand Dollars ($75,000.00) before the occurrence of the Overbid Deadline (the "Second Deposit").  The Deposit will be held in escrow by the Trustee and shall be released only as provided by this Agreement;

(3)    Buyer shall pay Seller One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00) at Closing.

v. <u>Due Diligence Review</u>. The Buyer and/or its agents and/or representatives shall until the Overbid Deadline (the "Due Diligence Review Period") to continue the review of the business of, and the legal and accounting matters associated with, the Debtor, the Equity, and the Companies (the "Due Diligence Review"). The Buyer will be given access by the Trustee to Records concerning the Debtor and the Companies subject to the execution of a mutually-acceptable Confidentiality and Non-Disclosure Agreement ("NDA").

vi.   <u>Buyer's Right to Terminate</u>. Notwithstanding anything to the contrary contained in this Agreement, the obligation of the Buyer to Close under this Agreement, including its obligation to pay the Purchase Price, is subject to Buyer's satisfaction, in its sole and absolute discretion, with the results of its Due Diligence Review.  At any time on or before the expiration of the Due Diligence Review Period, Buyer may elect to terminate this Agreement, by giving written notice of termination to Seller (the "Buyer Termination Notice") by any reasonable means, including email to Seller's counsel, based on Buyer's determination, in its sole and absolute discretion, that it is not satisfied with the results of its Due Diligence Review.  If Buyer does not provide a Buyer Termination Notice on or before the expiration of the Due Diligence Review Period, the Buyer shall be deemed to have completed and be satisfied with the results of its Due Diligence Review. In the event that the Buyer delivers a Buyer Termination Notice to the Seller, then this Agreement shall terminate without any further liability or obligation hereunder on the part of any party, except that all obligations in the NDA shall survive the termination of this Agreement. The Seller shall return all deposits made by the Buyer within seven days after receipt of a Buyer Termination Notice.

vii.   <u>Break Up Fee</u>. In the event that the Bankruptcy Court approves a higher or better offer for the purchase of the Equity from a Person other than the Buyer or any Person directly or indirectly Affiliated with or otherwise related to the Buyer or any nominee thereof, and the Seller closes a sale transaction with that other buyer, then the Buyer shall be paid upon from the proceeds of the sale of the Equity to such other Person the sum of no more than Fifty Thousand  Dollars ($50,000.00) (the "Break Up Fee"), subject to the approval of the Bankruptcy Court.

viii.   <u>Higher and Better Offers</u>. Subject to the terms and conditions contained in Paragraph 8(E) of this Agreement, the Buyer acknowledges and agrees that this Agreement is subject to higher or better offers for the Equity which may be solicited by and/or received by the Seller through an auction. The Buyer shall have the right and opportunity, but not the obligation, to make one (1) or more competitive bids at an auction to be held on or before December 27, 2022 (the "Auction"). If the Buyer's bid is not accepted and approved by the Bankruptcy Court, the Seller's obligation to sell the Equity to the Buyer shall terminate without any further liability or obligation on the part of any Party, and this Agreement shall terminate without any party having any further liability or obligation hereunder, except for Seller's obligation to refund the First and Second Deposits to the Buyer, and to pay the Break-Up Fee if and to the extent approved by the Bankruptcy Court.

ix.   <u>Subsequent Bidding Terms</u>.  In the event that the Seller desires and/or is required to seek additional bids (each an "Additional Bid") for the Equity, then the parties agree as follows:

(1)    The Seller will only consider and/or accept Additional Bids from the Buyer or from a "Qualifying Bidder" (as defined hereinafter).  For purposes of this Agreement, a Qualifying Bidder shall be defined as a bidder that has made a Qualifying Bid (as defined hereinafter) on or before the

- 5 -

deadline to submit such Qualifying Bid, which deadline shall be no later than December 23, 2022 at 5 p.m. EST (the "Overbid Deadline").

(2) For purposes of this Agreement, a "Qualifying Bid" is defined as: a written offer that (i) provides that the bidder shall purchase the Equity on terms which, in the business judgment of the Seller, are no less favorable to the Estate than those contained in this Agreement and/or any Additional Bid from the Buyer; (ii) does not provide and/or entitle any such bidder to any transaction or break-up fee, expense reimbursement, termination, or similar type of fee or payment; (iii) does not contain any due diligence, financing or regulatory contingencies of any kind; (iv) is at least Two Hundred Thousand Dollars ($200,000.00) (the "Minimum Overbid") higher than the Purchase Price or One Million Seven Hundred Thousand Dollars ($1,700,000.00) (the "Minimum Bid Increment") higher than the most recent highest bid contained in any subsequent Qualifying Bid; (v) contains such financial disclosures and documentation which demonstrate, in the Trustee's sole business judgment, the potential bidder's financial and other capabilities to consummate the Additional Bid; and (vi) fully discloses the identity of each person and/or entity that is bidding for the Equity or otherwise participating in connection with such bid and the complete terms of any such participation. Within 24 hours after the Overbid Deadline, the Trustee shall notify the Buyer of all Qualifying Bids that the Trustee has received, along with a copy of each such Qualifying Bid.

x. <u>Title</u>. The Seller shall convey to Buyer the Equity, and shall request Bankruptcy Court approval to convey the Equity free and clear of any and all Liens and Interests or other restrictions on transfer, except with respect to lien asserted by Creek Mountain Partners, Inc. on 592,682 shares of Series A Preferred Shares in Olaregen owned by Debtor. Upon the consummation of the Closing, the Seller shall transfer and convey to the Buyer, and Buyer shall be vested with any title to, the Equity that Debtor owns, free and clear of any Liens and Interests or other restrictions on transfer, subject to Bankruptcy Court approval.

xi. <u>Conditions Precedent to Buyer's Obligations</u>. The obligations of Buyer under this Agreement are subject to the satisfaction of the following conditions on or prior to the Closing Date, all or any of which may be waived in writing by Buyer:

(1) The Agreement has not been terminated by the Buyer pursuant to its rights under this Agreement.

(2) The Seller shall have delivered all documents required to sell, convey, transfer, deliver and assign to the Buyer the Equity, and all such documents shall have been properly executed by the Seller.

(3) The Seller shall be able to sell, convey, transfer, deliver and assign to the Buyer the Equity free and clear of any and all liens, claims,

and encumbrances, except that the Creek Olaregen Equity shall be taken subject to any valid lien asserted by Creek Mountain Partners, Inc.

(4)    The Court shall have entered the Sale Order, in a form approved by the Buyer (in the Buyer's sole discretion that, among other things: (i) authorizes the sale of the Equity to Buyer; (ii) is not be subject to any stay and is final and nonappealable; and (iii) finds that the Buyer is a good faith purchaser within the meaning of Section 363(m); (iv) makes the Equity Findings; and (v) finds that there has been no share issuance or other event causing dilution of the Equity.

xii.    <u>Conditions Precedent to Seller's Obligations</u>. The obligations of the Seller under this Agreement are subject to the satisfaction of the following conditions on or prior to the Closing Date, all or any of which may be waived in writing by the Seller:

(1)    The Buyer shall have delivered to the Seller all documents required to be delivered by the Buyer, and all such documents shall have been properly executed by the Buyer.

(2)    The Buyer shall have tendered the Purchase Price in accordance with the terms set forth in this Agreement.

(3)    The Bankruptcy Court shall have entered the Sale Order authorizing the sale of the Equity to Buyer and it shall not be subject to any stay.

xiii.    <u>The Closing</u>. Unless otherwise agreed to in writing by the parties, the closing contemplated by this Agreement (the "Closing") shall take place on or before January 30, 2022, so long as Sale Order is entered by December 30, 2022 and is not subject to any stay (the "Closing Date").  However, the Parties shall have the ability to extend Closing if mutually agreed in writing by both Parties.

xiv.    <u>Brokers</u>. Neither the Seller nor anyone acting on behalf of the Seller has employed, either directly or indirectly, or incurred any liability to, any broker, finder or other agent in connection with this Agreement.

**RELIEF REQUESTED**

**A.    Approve of Bidding Procedures and Terms of Sale**

6.    In order to ensure that the maximum value is received for the Property, the proposed sale will be subject to the highest and best bidder at auction.  The Trustee seeks to adopt procedures which will foster competitive bidding among potential buyers, without eliminating or discouraging any qualifying bids.  In connection therewith, the Trustee requests that the Court approve the

following bidding and sale procedures, which the Trustee believes are likely to maximize the

realizable value of the Equity (the "Sale Procedures"):

     i.    Participation Requirements:  Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must:

     (1)    Wire into the trust account of the Trustee an escrow deposit of Two Hundred Thousand Dollars ($200,000.00) so that the wire is confirmed to be received by the Trustee through a balance verification of the Trustee's trust account no later than 5:00 p.m. EST on December 23, 2022 (the "Bid Deadline");

     (2)    Submit to the Trustee and Akerman LLP on or before the Bid Deadline: (A) a fully executed equity purchase agreement ("EPA") substantially in the form of the EPA to be provided by the Trustee (the effectiveness of such EPA being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court approval, with no due diligence or financing contingencies), with a purchase price of not less than One Million Seven Hundred Thousand Dollars ($1,700,000.00), and (B) a black-lined version of the EPA to show any changes made by such bidder; provided that, an EPA with any material changes may be rejected by the Trustee in its sole business judgment; and

     (3)    Submit to Akerman and the Trustee on or before the Bid Deadline such financial disclosures and documentation which demonstrate, in the Trustee's sole business judgment, the potential bidder's financial and other capabilities to consummate the sale.

     ii.    A person who timely complies with these Participation Requirements shall have submitted a "Qualified Bid" and shall be deemed a "Qualified Bidder."  The list of Qualified Bidders will not be shared with anyone prior to the Auction except the Stalking Horse Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder.

     iii.    Waiver of Conflicts:  Any person who has submitted a Qualified Bid shall be deemed to have waived any right to claim there is a conflict with respect to an unrelated transaction for which such person has employed the law firm of Akerman LLP, or Furr Cohen, P.A., and the Trustee's employment of Eyal Berger, Esq. and the law firm of Akerman LLP as counsel for the sale of the Equity and related transactions contemplated therein.

     iv.    Deadline to Object: The deadline to object to the Stalking Horse Bid and sale procedures is December 16, 2022.

v.    Auction:  In the event the Trustee receives a timely Qualified Bid, the Trustee will conduct an auction (the "Auction"). The Auction shall take place on December 27, 2022 beginning at 9:30 a.m. via Zoom videoconferencing, or such other time or place as the Trustee shall notify the Qualified Bidders. In the event the Trustee does not receive a timely Qualified Bid, the Trustee will seek final approval of the sale to the Stalking Horse bidder at the Sale Hearing.

vi.    Auction Procedures:  At the Auction, the Trustee will identify the Qualified Bid which shall serve as the opening bid.

(1)    All Qualified Bidders shall be entitled to make any subsequent bids in increments of not less than $50,000.00 (a "Subsequent Bid").  Bidding at the Auction shall continue until such time as the highest or best offer is determined by the Trustee in the exercise of his sole business judgment.  The Trustee reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in his sole business judgment.

(2)    Each Qualified Bidder's offer shall be irrevocable until the selection of the Successful Bidder and, if applicable, the Back-Up Bidder (as set forth in the EPA), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the sale to the Successful Bidder or the Back-Up Bidder.

vii.    Broker's Commissions: The bankruptcy estate shall not be liable for any broker commissions.

viii.    Successful Bid:  After the conclusion of the Auction, the Trustee shall submit the highest or best bid that has been accepted (the "Successful Bid") for approval by the Bankruptcy Court at a hearing at the United States Courthouse, 299 E. Broward Blvd, Courtroom 301, Fort Lauderdale, FL  33301 on December 27, 2022 at 2:30 p.m. EST following the auction (the "Sale Hearing").  The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to as the "Successful Bidder."

ix.    Closing Date:  The closing of the transaction (the "Closing") shall take place on or before January 30, 2023, so long Sale Order is entered by December 30, 2022  and is not subject to any stay (the "Closing Date"), subject to the terms of the EPA.  The Successful Bidder must be prepared and must in fact consummate the purchase of the Equity in accordance with the EPA.

x.    Back Up Bid:  Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Equity because of a breach or failure on the part of the Successful Bidder, then the Trustee may elect in his business judgment to close with the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "Back Up Bidder").  At the Sale Hearing, the Trustee intends to seek approval from the Court for the next highest or best bid (the "Back Up Bid"), which approval

shall authorize the Trustee to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court. Promptly following the conclusion of the Sale Hearing, the Trustee shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder).

xi.     As is/where is:  The Equity will be sold "as is", "where is", with all faults, with no guarantees or warranties, express or implied.

xii.    Sale Hearing:  The Trustee requests that a final Sale Hearing be scheduled to be held immediately following the Auction on December 27, 2022.

**B.      Form and Manner of Notice of Sale Procedures and Sale.**

7.      Pursuant to Bankruptcy Rule 2002(a), the Trustee is required to provide creditors with 21 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing.  The Trustee will serve the Motion on the Debtor, all creditors scheduled on the creditor matrix, the Office of the United States Trustee, and on the registered agent and corporate management of NGIO and Olaregen.  After the passage of the proof of claim deadline on November 3, 2022, the Trustee will serve the Motion on all creditors who have filed a proof of claim.  In addition, the Trustee will serve upon all creditors and interested parties the Order granting the Motion (the "Sale Procedures Order"), in a form substantially as attached hereto as **Exhibit 2**, which shall set forth among other things, the Sale Procedures, and the time, date, and place of the Auction and Sale Hearing.

8.      Further, the Trustee will publish notice of the proposed sale free and clear of all Liens and Interests, as hereinafter defined, pursuant to Section 363(f) of the Bankruptcy Code in (a) the Wall Street Journal not less than once per week for two consecutive weeks. Such publication notice will set forth the time, date, and place of the Auction and Sale Hearing.

C.        **Approval of Break-Up Fee.**

9.        To compensate the Stalking Horse Bidder for serving as the "stalking horse" thereby subjecting its bid to higher or better offers, the Trustee seeks authority to pay the Break-Up Fee in the amount of Fifty Thousand Dollars ($50,000.00) if the Bankruptcy Court approves a higher or better offer for the purchase of the Equity from a person other than the Stalking Horse Bidder or any person directly or indirectly affiliated with or otherwise related to the Stalking Horse Bidder or any nominee thereof, and the Seller closes a sale transaction with that other buyer.

10.       The ability of the Trustee to offer the Stalking Horse Bidder the Break-Up Fee benefits the estate because it affords the Trustee the means necessary to induce the Stalking Horse Bidder to submit its bid prior to the Auction, and thereby establish a "floor" and appropriate parameters for submission of Qualified Bids in connection with the Auction.  Thus, even if the Stalking Horse Bidder is paid the Break-Up Fee because it is not the Successful Bidder, the estate will have benefited from the higher floor established by the Stalking Horse and the certainty that such bid brings to the sale process.  Approval of break-up fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant property pursuant to section 363 of the Bankruptcy Code therefore has become an established practice in bankruptcy cases. *See, e.g., In re Gemini Cargo Logistics, Inc.*, No. 0610870 (Bankr. S.D. Fla. Apr. 17, 2006); *In re Piccadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. Sept. 14, 2004).

11.       Moreover, the amount of the Break-Up Fee is approximately 3.33% of the Purchase Price and is consistent with the range of break-up fees approved by Courts in this District and otherwise. *See In re Protective Products of America, Inc., et al.*, No. 10-10711-JKO (Bankr. S.D. Fla. Jan. 19, 2010) (approving 4% break-up fee and expense reimbursement);  *In re 160 Royal Palm, LLC,* No. 18-19441-EPK (Bankr. S.D. Fla. Nov. 9, 2018) (approving break-up fee of

$350,000, constituting 1.09% of purchase price); *In re Tousa, Inc., et al.*, Case No. 08-10928-JKO (Bankr. S.D. Fla. Dec. 21, 2009) (approving 3% break-up fee).

12.     The Trustee believes, in his business judgment, that the Break-Up Fee is reasonable and appropriate in view of, among other things, the size and nature of the transaction contemplated by the EPA.  Moreover, the Break-Up Fee was a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the EPA.  Accordingly, the Trustee requests that the terms of the EPA relating to the Break-Up Fee be approved.

**D.     Ownership of Equity**

13.     The Trustee seeks express findings of fact that the Equity is property of the Debtor's bankruptcy estate.

        **(i)     Olaregen Therapeutix, Inc.**

14.     Olaregen Therapeutix Inc. ("Olaregen") is a New York based regenerative medicine company engaged in the development, manufacturing and commercialization of products that fill unmet needs in current wound healing market.  Olaregen's proprietary, patented, wound conforming gel matrix, Excellagen, is an FDA-cleared, topically applied wound healing product for the management of 17 wound healing indications.  *See* Generex Form 10-K for fiscal year-end July 31, 2020, pp. 5, 16-17, 97,[1] attached as Exhibit 1 to the Appendix filed contemporaneously with this Motion; Olaregen website, https://www.olaregen.com/about-us-2/.

15.     On November 27, 2018, Generex and Olaregen entered into a binding letter of intent ("LOI") contemplating the Company's acquisition of 51% of the outstanding capital stock of Olaregen for a total consideration of twelve million dollars ($12,000,000).  *See* Generex 8-K

---

[1] The page numbers for the SEC filings refer to the page numbers at the bottom middle of each page of the report.

dated November 27, 2018, attached as Exhibit 2 to the Appendix; Binding Letter of Intent attached as Exhibit 3 to the Appendix.

16.     On January 7, 2019, pursuant to a Stock Purchase Agreement, Debtor acquired 3,282,632 common stock shares, representing 51% of the outstanding capital stock, of Olaregen Therapeutix Inc. ("Olaregen") for an aggregate of $12,000,000, among which $400,000 was paid in cash and the remainder was paid by the issuance of a promissory note in the amount of $11,600,000 ("Olaregen Note").  *See* Stock Purchase Agreement, attached as Exhibit 4 to the Appendix; Generex 8-K dated January 7, 2019, attached as Exhibit 5 to the Appendix.  The Olaregen Note is secured by a pledge of the Olaregen Shares pursuant to a Pledge and Security Agreement.  *Id*.  In the event that Debtor failed to pay the final installment of $6,000,000 due on the Olaregen Note, Debtor was to forfeit the shares allocated to that installment (1,600,000 Olaregen shares) and Olaregen will be entitled to "claw back" fifty percent (50%) of any and all shares paid for by the prior payments.  *Id*.

17.     On March 14, 2019, the Debtor and Olaregen amended the Stock Purchase Agreement and Olaregen Note to extend the due date of the remaining balance of the second tranche of payments amounting to $600,000 on or before April 1, 2019.  *See* Appendix, Ex. 1, p. 129; Amendment Agreement attached as Exhibit 6 to the Appendix.  The Debtor remitted additional payments of $200,000 on April 30, 2019 and $38,500 on May 17, 2019.  *Id*.  On May 22, 2019, the Debtor and Olaregen amended the agreement to extend the due date of the remaining balance of the second tranche of payments amounting to $361,500, the full balance of the third tranche amounting to $3,000,000 and the full balance of the fourth tranche amounting to $1,000,000 (total of $4,361,500) on or before June 30, 2019.  *Id*.

18.     On March 14, 2019, Olaregen elected the option to proportionally increase the per share purchase price to $4.00 for the remaining 2,899,658 of the total 3,282,632 shares to be acquired. *See* Appendix, Ex. 1, p. 88; Appendix, Ex. 6.  This resulted in an additional $998,633 for the Debtor to remit to Olaregen pursuant to the acquisition.  *See* Appendix, Ex. 1, p. 88.

19.     In May 2019, Debtor acquired from Creek Mountain Partners, LLC 592,683 shares of Series A Preferred Stock of Olaregen ("Creek Olaregen Equity") pursuant to a Stock Purchase Agreement entered into January 14, 2019, subject to the approval of the Board of Directors of Olaregen and consummated on May 10, 2019.  *See* Appendix, Ex. 1, p. 114; Stock Purchase Agreement, attached as Exhibit 7 to Appendix. Debtor acquired the Creek Olaregen Equity in exchange for 4 million shares of the Debtor's common stock, contributed and provided by the Friends of Generex Biotechnology Investment Trust,[2] plus the issuance of a $2 million promissory note, *id.*,  thereby increasing Debtor's interest in Olaregen to approximately 62% of Olaregen's outstanding voting shares.    *See* Appendix, Ex. 1, p. 2.  The 592,683 Olaregen shares represent approximately 10% voting control of Olaregen.  *See* Appendix, Ex. 1, p. 113.  The $2,000,000 note was extended to have a maturity date of August 1, 2019.  *Id*.

20.     On August 16, 2019, Debtor entered into a Share Exchange Agreement to purchase an additional 900,000 shares of common stock in Olaregen from other shareholders of Olaregen in exchange for 1,905,912 shares of Generex common stock and 476,478 shares of NGIO common stock which increased Debtor's interest in Olaregen to approximately 77% of Olaregen's outstanding voting shares.  *See* Appendix, Ex. 1, p. 113; Share Exchange Agreement attached as

---

[2] The provided shares by the Friends of Generex Trust were already issued and outstanding and did not result in any expense of the Debtor.  Since these shares were transferred, to the shareholders of Olaregen, by an existing shareholder to settle an obligation of the Debtor, the value of the shares provided by the Friends of the Generex Trust to settle the debt was reflected in the financial statements as an addition to contributed (paid-in) capital.  *See* Appendix, Ex. 1, p. 70.

Exhibit 8 to Appendix.  The Share Exchange Agreement indicated that the 900,000 shares was 32.18% of the remaining shares, and the exhibit stated that an additional 1,461,075 shares of common stock were outstanding.  *See* Appendix, Ex. 8.

21.    In September 2019, the Debtor converted all of the Series A Preferred Stock of Olaregen into common stock of Olaregen.  *See* Appendix, Ex. 1, p. 5.

22.    On November 24, 2019, the Debtor and Olaregen amended the Stock Purchase Agreement and Promissory Note to extend the due date of the remaining balance of the Olaregen Note.  *See* Appendix, Ex. 1, p. 88.  Effective November 24, 2019, the deadline was extended to January 31, 2020.  *See* Appendix, Ex. 1, p. 88, 108.

23.    On February 14, 2020, the remaining stockholders of Olaregen exchanged all of its outstanding shares for 5,950,000 shares of Generex common stock and 2,765,000 shares of NGIO, s*ee* Appendix, Ex. 1, p. 113, with a waiver of any penalties and accrued interest on the outstanding Olaregen Note.  *See* Appendix, Ex. 1, p. 108; Letter Agreement attached as Exhibit 9 to Appendix. As a result of this transaction, Debtor owns 100% of the outstanding shares of Olaregen.  *See* Appendix, Ex. 1, p. 5, 79.

24.    According to Debtor's most recent SEC filing, a 10-Q for quarter ending April 30, 2021, Olaregen continues to be wholly-owned by the Debtor.  *See* 10-Q for Generex for quarter ending April 30, 2021, pp. 7, 14, 32, 42, attached as Exhibit 10 to Appendix.

25.    Based on the foregoing, Trustee seeks the following factual findings (collectively, the "Olaregen Findings") in the Sale Procedures Order that: (a) Olaregen has 6,236,390 common stock shares outstanding and no preferred or other classes of equity interests; (b) the Debtor owns 6,236,390 shares of Olaregen's common stock, representing 100% of the outstanding shares of Olaregen; (c) that the Debtor's 100% ownership of Olaregen stock is property of the bankruptcy

estate and the Trustee has authority to convey the Olaregen stock to the Buyer; (d) that Creek Mountain's Lien, if valid and enforceable, would attach only to 592,683 common shares of Olaregen; (e) no other person or entity has any rights, interest, or equity in the shares of Olaregen; and (f) there has been no share issuance or other event causing dilution of Debtor's equity in Olaregen.

     (ii)   **Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology, Inc.**

    26.   On August 8, 2003, Generex Biotechnology, Inc. ("Generex") acquired all of the outstanding capital stock of Antigen Express, Inc. ("Antigen") pursuant to an Agreement and Plan of Merger (the "Merger Agreement") among Generex, Antigen and AGEXP Acquisition, Inc. ("AGEXP"), a wholly owned subsidiary of Generex formed for purposes of the transaction. *See* Generex Form 8-K filed August 8, 2003, attached as Exhibit 11 to Appendix.

    27.   Antigen was engaged in research and development efforts focused on the development of immunomedicines for the treatment of malignant, infectious, autoimmune and allergic diseases. Antigen's potential products are based on two platform technologies (Ii-Key hybrid peptides and Ii-Suppression) discovered by founder, Dr. Robert E. Humphreys. *Id.*

    28.   On December 30, 2019, the company filed for name change, changing its name to NuGenerex Immuno-Oncology, Inc.   *See* Certificate of Amendment of Certificate of Incorporation, attached as Exhibit 12 to Appendix.

    29.   Prior to filing, NGIO was an oncology company focused on the modulation of the immune system to treat cancer. NGIO is developing immunotherapeutic products and vaccines based on our proprietary, patented platform technology, Ii-Key. The Ii-Key is a peptide derived from the major histocompatibility complex (MHC) Class II associated invariant chain (Ii) that regulates the formation, trafficking, and antigen-presenting functions of MHC class II complexes,

essential for the activation of T cells in the immune response. *See* NGIO 10-K for year ending July 31, 2020, attached as Exhibit 13 to Appendix, p. 3.

30.     According to the 10-K for NGIO, NGIO had 400,300,000 shares of common stock, outstanding as of October 28, 2020. *See* Appendix, Ex. 13, p. 1.

31.     On January 20, 2021, NGIO designated 100,000 shares of preferred stock as "Series A Super Voting Preferred Stock." *See* NGIO 8-K for quarter ending April 30, 2021, attached as Exhibit 14 to Appendix, p. 13. The holders of the Series A Super Voting Preferred Stock are entitled to dividends, conversion, redemption, or liquidation preference and have the right to vote in an amount equal to 3,000 votes per share. *Id*.

32.     On February 2, 2021, NGIO issued 100,000 shares of the Series A Super Voting Preferred Stock to Debtor in exchange for 300,000,000 shares of NGIO's common stock, which were immediately cancelled after the exchange. *Id.*

33.     According to the most recent 8-K for NGIO, as of June 14, 2021, NGIO had 100,300,000 shares of common stock outstanding, of which Debtor owns 64,153,151 shares. *Id.*

34.     The Debtor owns 64,153,151 common stock shares of NGIO and 100,000 shares of NGIO's Series A Super Voting Preferred Stock, according to the Debtor's most recent quarterly SEC filing, the 10-Q for quarter ending April 30, 2021. *See* Appendix, Ex. 10, p. 40.

35.     Based on the foregoing, the Trustee seeks the following factual findings (collectively, the "NGIO Findings') in the Sale Procedures Order that: (a) NGIO has 100,300,000 common stock shares outstanding, and that the Debtor owns 64,153,151 of such common stock shares of NGIO; (b) NGIO has 100,000 Series A Super Voting Preferred Stock outstanding, and that the Debtor owns all 100,000 shares of such Series A Super Voting Preferred Stock; (c) there are no other classes of equity interests in NGIO; (d) that the Debtor's equity in NGIO is property

of the bankruptcy estate and the Trustee has authority to convey the NGIO stock to the Buyer; (e) no other person or entity has any rights, interest, or equity in the Debtor's shares of NGIO; and (f) there has been no share issuance or other event causing dilution of Debtor's equity in NGIO.

**E.    Injunctive Relief to Preclude Transfer or Dilution Prior to Sale**

36.    In the EPA, the Trustee has agreed not to sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of any of the Equity.  The Trustee has further agreed not to issue any additional equity or take any action to dilute the existing Equity subject to this agreement. This term was a material inducement to the Stalking Horse Bidder to protect the value of the Equity prior to the sale of the Equity.  The Trustee submits it is an appropriate and necessary protection pending the sale pursuant to 11 U.S.C. § 363.

37.    To effectuate the intent of this provision, the Trustee requests that in the Sale Procedures Order, the Court enjoin any and all parties from issuing any additional equity or taking any action to dilute the existing Equity subject to this agreement.  The Sale Procedures Order will be served on the management of both NGIO and Olaregen.

38.    In addition to the Court's authority under 11 U.S.C. § 105 to issue any order necessary or appropriate to carry out the provisions of the Bankruptcy Code, such injunction against further issuance of additional equity or taking any actions to dilute the existing Equity is justified by an SEC request that the Trustee consent to halt further over-the-counter trading of shares of NGIO based on the SEC's recent order instituting administrative proceedings, and by an Order of the Southern District of New York court enjoining the transfer or dissipation of assets of the Debtor.  *See* SEC Order, attached as Exhibit 15 to Appendix, and Order of the Southern District of New York Court attached as Exhibit 16 to Appendix.

**F.      Sale of Equity as Property of the Estate Free and Clear of Liens and Interests, Claims and Encumbrances**

39.      Pursuant to Section 363(b) of the Bankruptcy Code, the Trustee seeks to sell the Equity to the highest or best bidder following the Auction, free and clear of all liens, claims, encumbrances, and interests to the fullest extent possible under applicable law except with respect to any valid lien asserted by Creek Mountain Partners, Inc. on 592,682 shares of Series A Preferred Shares in Olaregen ("Creek Olaregen Equity") owned by Debtor pursuant to UCC-1 Financing Statement filed by Creek Mountain Partners, Inc. by reason of the UCC-1 Financing Statement filed on January 28, 2020 under UCC Filing No. 2020 0618696 ("Creek Lien") (with all liens, claims, encumbrances, or interests  except the Creek Lien referred to as the "Liens and Interests"). The Buyer will take Creek Olaregen Equity subject only to any valid lien asserted by Creek Mountain Partners, Inc.

40.      The Trustee seeks the entry of an Order, substantially in the same form as the proposed order attached hereto as **Exhibit 2**, authorizing the Trustee to sell and convey the Equity free and clear of the Liens and Interests, including but not limited to the interest held by Oasis Capital, LLC ("Oasis") by reason of the UCC-1 Financing Statement filed on January 25, 2022 with the Delaware Secured Transaction Registry under UCC Filing No. 2022 0669879 ("Oasis UCC-1").

41.      The Trustee requests that the Order further provide that the Liens and Interests shall attach to the proceeds of the sale of the Equity in the order of their priority, with the validity, force and effect that they had as of the Petition Date, if any, against the Equity, subject to the rights, claims, defenses and objections of the Trustee and all interested parties with respect to such liens, so that the purchaser of the Equity shall take the Equity free of all the Liens and Interests.

42.     Section 363(f) of the Bankruptcy Code authorizes the Trustee to sell property of the estate free and clear of any liens, claims or encumbrances if one of the following is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

43.     The language of Section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any of the aforementioned conditions is met. *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

44.     The Trustee believes that Section 363(f)(4) applies, as the purported lien of Oasis is the subject of a bona fide dispute.  The Oasis UCC-1 was filed, and thus its security interest was perfected, less than 90 days before the Petition Date.  Accordingly, the lien is subject to avoidance as a preference.

45.     Moreover, Section 363(f)(5) applies, as Oasis could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  Section 363(f)(5) has been interpreted as applying where an entity could be forced to compelled to accept less than full payment of the underlying debt in any actual or potential proceeding, under applicable nonbankruptcy law or bankruptcy law.  *In re Healthco Intern., Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994); *In re Hamilton Rd. Realty LLC*, 8-19-72596-REG, 2021 WL 1620046, at *6 (Bankr. E.D.N.Y. Apr. 26, 2021).  Moreover, some courts have applied the section on a hypothetical basis, so that, for example, if an lien holder could be compelled to accept less than payment in full in satisfaction of its lien in a Chapter 11 cramdown proceeding, the same would be permitted in a

Chapter 7 proceeding. *In re Healthco Intern., Inc.*, 174 B.R. at 176-177. Since Oasis could be forced to accept monetary payment in satisfaction of its purported lien, either in a non-bankruptcy action to foreclose their interest or in a Chapter 11 cramdown, Section 363(f)(5) is met.

**G.    Sale of the Equity is in Good Faith**

46.    The Trustee requests that the Court find that the proposed sale to the Stalking Horse Bidder, or the Successful Buyer, is in good faith under Section 363(m).

47.    The Trustee will have provided notice of the sale and the Sale Procedures to all creditors, NGIO, and Olaregen, and provided publication of same in the Wall Street Journal not less than once per week for two consecutive weeks.

48.    The Stalking Horse Bid was negotiated at arm's length over several weeks between sophisticated counsel, and after fielding multiple potential buyers for the Equity.

49.    Although the Stalking Horse Bidder group includes a former insider of the Debtor, Andrew Ro, the group also includes outside investors, and none of the group has any relationship to the Trustee. The Trustee has given all other interested purchasers access to the same information to which the Stalking Horse Bidder was given access.

50.    The Trustee submits that as a result of the Auction, and the procedures requested herein, the sale will be for a fair and reasonable price and is conducted in good faith.

51.    In connection therewith, the Trustee submits the Stalking Horse Bidder (or the Successful Bidder) will have acted in good faith and therefore the Trustee requests that the Sale Order provide appropriate findings and protections pursuant to Section 363(m) of the Bankruptcy Code.

52.     Collectively, the factors evidence that the Trustee's proposed sale of the Equity to the highest and best bidder at auction, without any further delay, is in the best interest of all creditors of the estate.

**H.     Limitations on Credit Bids**

53.     The Trustee is aware of an alleged lien asserted by Oasis on all of the assets of the Debtor, which lien the Trustee believes is subject to a bona fide dispute and the perfection of which the Trustee will be seeking to avoid as a preferential transfer.

54.     For the same reason, the Trustee seeks to limit the credit bids by Oasis.

55.     Pursuant to section 363(k), the Court has the power to limit a creditor's right to credit bid for cause. Section 363(k) states that:

> (k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, *unless the court for cause orders otherwise* the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11. U.S.C. § 363(k) (emphasis added).

56.     "[O]nly an allowed claim under § 502 is entitled to "credit bid" at § 363(b) sale." *In re RML Dev., Inc*., 528 B.R. 150, 154 (Bankr. W.D. Tenn. 2014). While a secured creditor has the right to credit bid, the "law is equally clear, as Section 363(k) provides, that the Court may for cause order otherwise." *In re Fisker Auto. Holdings, Inc*., 510 B.R. 55, 59 (Bankr. D. Del. 2014) (quotations and citations omitted). Further, section 105(a) states that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

57.     "The term 'cause' is not defined in the Bankruptcy Code and is left to the courts to determine on a case-by-case basis." *In re Old Prairie Block Owner, LLC*, 464 B.R. 337, 348 (Bankr. N.D. Ill. 2011). Various courts have limited credit bid rights where a creditor's allowed

secured claim is in dispute, the creditor engaged in inequitable conduct and/or limiting a creditor's right to credit bid would foster a competitive bidding environment. For example, in *In re Daufuskie Island Properties, LLC*, the court determined that William R. Dixon ("Dixon") would not have the right to credit bid because his secured claim was disputed. 441 B.R. 60, 63 (Bankr. D.S.C. 2010).

58.     In *In re The Free Lance-Star Publ'g Co. of Fredericksburg, VA*, the debtors sought to sell its assets through an auction. 512 B.R. 798, 799-800 (Bankr. E.D. Va. 2014). Around the same time, the lender initiated an adversary for declaration that it had a valid and perfected lien on substantially all of the debtor's assets. *Id*. at 800. The court held an evidentiary hearing and determined that the lender did not have a valid lien on certain assets and could not credit bid its claim against such assets. *Id*.

59.     As an initial matter, Oasis presently does not have any allowed claim. On this basis alone, Oasis does not have the right to credit bid.

60.     To the extent Oasis files a proof of claim, at the very least the secured nature of the claim will be subject to dispute as the Oasis UCC-1 was filed within the preference period.

**I.      Trustee Will Comply with Applicable Securities Law**

61.     Since NGIO is a public company, the Trustee will comply with applicable law related to the sale of securities.  As part of such compliance, the solicitation of higher and better bids will be limited to accredited investors that are exempt from prospectus and disclosure requirements applicable to retail investors under securities laws.  The proposed Stalking Horse Bidder is exempt from such prospectus requirements as it meets the requisite sophistication and investment limits.

62.     Accordingly, the Trustee requests that the Court restrict the potential purchasers to only those purchasers who are exempt from securities disclosures.

**J        Waiver of Stay Period Pursuant to Fed. R. Bankr. P. 6004(h)**

63.    To the extent necessary, the Trustee requests that the Court waive the 14-day stay period pursuant to Fed. R. Bankr. P. 6004(h).

**K.        Scheduling Auction and Final Hearing on Sale Motion**

64.    The Trustee requests that the Court schedule the Sale Hearing to consider final approval of the sale of the Equity immediately following the Auction on December 27, 2022.

**WHEREFORE**, the Trustee respectfully requests that this Court enter an Order substantially in the same form as the order attached hereto as **Exhibit 2**:

i) granting the Motion,

ii) approving the Equity Purchase Agreement between Trustee and the Stalking Horse Bidder;

iii) authorizing the Trustee to schedule an auction sale of the Equity,

iv) approving the Sale Procedures and Break-Up Fee in connection with auction sale,

v) approving the form and manner of notice of sale,

vi) making the equity findings as to Debtor's interest in the Equity as detailed in the Motion, and finding that the Stalking Horse Bidder is a purchaser in good faith under Section 363(m);

vii) scheduling the Sale Hearing,

viii) approving the sale of the Debtor's interest in the Equity, free and clear of the Liens and Interests as set forth herein, and

ix) granting the Debtor such other and further relief as is proper.

Dated: October 14, 2022                  Respectfully submitted,

                                         By: */s/ Eyal Berger*    
                                         Eyal Berger, Esq.
                                         Florida Bar No.: 011069
                                         Email: eyal.berger@akerman.com
                                         AKERMAN LLP
                                         201 East Las Olas Boulevard, Suite 1800
                                         Fort Lauderdale, FL 33301-2999
                                         Tel: 954-463-2700
                                         Fax: 954-463-2224

                                         - and –
                                         Amanda Klopp, Esq.
                                         Florida Bar No. 124156
                                         Email: amanda.klopp@akerman.com
                                         AKERMAN LLP
                                         777 South Flagler Drive, Suite 1100, West Tower
                                         West Palm Beach, FL 33401
                                         Tel: 561-653-5000
                                         Fax: 561-659-6316
                                         *Counsel for the Trustee*

66647871;4

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 14, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served on this day by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case and/or via U.S. mail as reflected in the below service list.

*/s/ Eyal Berger*
Eyal Berger, Esq.

## SERVICE LIST

**22-13166-PDR Notice will be electronically mailed to:**

Marc P Barmat
barmat.trustee@furrcohen.com, mpb@trustesolutions.net

Eyal Berger, Esq. on behalf of Trustee Marc P Barmat
eyal.berger@akerman.com, jeanette.martinezgoldberg@akerman.com

Mark D. Hildreth, Esq on behalf of Creditor AVEM Medical, L.L.C., f/k/a MediSource Partners, LLC
mhildreth@shumaker.com, skerrigan@shumaker.com

Mark D. Hildreth, Esq on behalf of Creditor Pantheon Medical - Foot & Ankle, LLC
mhildreth@shumaker.com, skerrigan@shumaker.com

Mark D. Hildreth, Esq on behalf of Creditor Travis Bird
mhildreth@shumaker.com, skerrigan@shumaker.com

Zachary P Hyman on behalf of Petitioning Creditor Three Brothers Trading, LLC d/b/a Alternative Execution Group
zach@millenniallaw.com,
jessica@millenniallaw.com;assistant@millenniallaw.com;millenniallawforms@gmail.com

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov
**Via U.S. Mail**

Generex Biotechnology Corp.
10102 USA Today Way
Miramar, Florida 33025

Generex Biotechnology Corp.
c/o Registered Agent THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER 1209 ORANGE ST
WILMINGTON, DE 19801

Generex Biotechnology Corp.
c/o Registered Agent C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324

66647871;4

Generex Biotechnology Corp.
c/o President JOSEPH MOSCATO, JR.
10102 USA TODAY WAY
MIRAMAR, FL 33025

Generex Biotechnology Corp.
c/o Director BRIAN MCGEE
1065 EIGHTEENTH SIDEROAD
KING CITY UN

Generex Biotechnology Corp.
c/o Director ANDREW RO
132 EAST 43RD STREET, SUITE 550
NEW YORK, NY 10017

Generex Biotechnology Corp.
c/o VP/Chief Operating Officer Terry Thompson
845 CLAY PLACE
SPRING HILL, TN 37174

Generex Biotechnology Corp.
c/o Director JAMES ANDERSON
2733 WEST 166TH STREET
WESTFIELD, IN 46074

Generex Biotechnology Corp.
c/o Director MARK J PRIOLETTI
1121 PALMER COURT
CRYSTAL, IL 60014

Generex Biotechnology Corp.
CRAIG EAGLE
14A PONY CHASE
COBHAM SURREY GB

BHP Capital NY Inc
45 SW 9th Street
Miami, Fl 33130

Bedford Capital Group, LLC
32 Cutler Road
Greenwich, Ct 06831

Beijing Youfeng Biological Technology Co Ltd
8 Yard
Xingiong Middle Street
Gaobeidian,

GS Capital Partners, LLC
1 East Liberty Street, Suite 600
Reno, NV 89501

Generex Biotechnology Corp
10102 USA Today Way
Miramar, Fl 33025

U.S. Securities & Exchange Commission
Office of Reorganization
950 East Paces Ferry Road NE, Suite 900
Atlanta, GA 30326-1382

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Florida Dept. of Revenue
Bankruptcy Unit
P.O. Box 6668
Tallahassee, FL 32314-6668

Olaregen Therapeutix, Inc.
1001 6th Ave, 2nd Fl
New York, NY 10018

Olaregen Therapeutix, Inc.
1001 Avenues of the Americas
New York, NY 10018

Olaregen Therapeutix, Inc.
2nd Floor, 1001 Avenues of the Americas
New York, NY 10018
Attn: Anthony J. Dolisi, CEO & President

Olaregen Therapeutix, Inc.
c/o Registered Agent THE CORPORATION
1001 AVENUE OF AMERICA 2ND FL
NEW YORK, NY 10018

Olaregen Therapeutix, Inc.
c/o Registered Agent THE COMPANY CORPORATION
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

NuGenerex Immuno-Oncology, Inc.
c/o Registered Agent VCorp Services, LLC
1013 Centre Road Suite 403-B
Wilmington, DE 19805

NuGenerex Immuno-Oncology, Inc.
10102 USA Today Way
Miramar, Florida 33025

NuGenerex Immuno-Oncology, Inc.
c/o Registered Agent VCORP SERVICES, LLC
1200 S PINE ISLAND ROAD
PLANTATION, FL 33324

NuGenerex Immuno-Oncology, Inc.
c/o Director Richard Purcell
10102 USA Today Way
Miramar, Florida 33025

NuGenerex Immuno-Oncology, Inc.
c/o Director Marvin Hausman
10102 USA Today Way
Miramar, Florida 33025

NuGenerex Immuno-Oncology, Inc.
c/o Director Joseph Moscato
10102 USA Today Way
Miramar, Florida 33025

NuGenerex Immuno-Oncology, Inc.
c/o Director Anthony Crisci
10102 USA Today Way
Miramar, Florida 33025

Creek Mountain Partners, Inc.
3292 Main Street
Exmore, VA 23350

Creek Mountain Partners, LLC
PO Box 1445
Exmore, VA 23350

Oasis Capital, LLC
208 Ponce de Leon Ave, Suite 1600
San Juan, PR 00918

**CREDITOR MATRIX ATTACHED**

Label Matrix for local noticing
113C-0
Case 22-13166-PDR
Southern District of Florida
Fort Lauderdale
Fri Oct 14 10:16:12 EDT 2022

AVEM Medical, L.L.C., f/k/a MediSource Partn
c/o Mark D. Hildreth, Esq.
Shumaker, Loop & Kendrick, LLP
240 S. Pineapple Ave., 10th Floor
Sarasota, FL 34236-6717

BHP Capital NY Inc
45 SW 9th Street
Miami, Fl 33130-3894

Bedford Capital Group, LLC
32 Cutler Road
Greenwich, Ct 06831-2509

GS Capital Partners, LLC
1 East Liberty Street, Suite 600
Reno, NV 89501-2110

Generex Biotechnology Corp
10102 USA Today Way
Miramar, Fl 33025-3903

Pantheon Medical - Foot & Ankle, LLC
c/o Mark D. Hildreth, Esq.
Shumaker, Loop & Kendrick, LLP
240 S. Pineapple Ave., 10th Floor
Sarasota, FL 34236-6717

Three Brothers Trading, LLC d/b/a Alternativ
c/o Zachary Hyman
501 E. Las Olas Blvd Suite 200/308
Fort Lauderdale, Fl 33301-2881

Andrew Ro
207 East 27th Street Apt 5J
New York, NY 10016-9133

Andrew Ro
c/o Lessne Law
Attn: Michael Lessne
100 SE 3rd Ave, 10th Floor
Fort Lauderdale, FL 33394-0002

Beijing Youfeng International Consulting Co.
1990 M Street, NW
Suite 660
Washington DC 20036-3417

Brooks Houghton & Company Inc.
One Stamford Plaza
9th Floor
Stamford, CT 06901
Carmel, Milazzo & Feil LLP
55 West 39th Street  06901-3271

CDW
Attn: Ronelle Erickson
200 N Milwaukee Ave.
Vernon Hills, IL 60061-1577

Discover Growth Fund LLC
5330 Yacht Haven Grande
Ste. 206
St Thomas, VI 00802
Donohoe Advisory Associates LLC
9901 Belward Campus Drive  00802-5028

HMBL Consulting LLC
9224 Meadowglen Drive
Dallas, TX 75238-3333
HostGator.com
5005 Mitchelldale Suite #100
Houston, TX 77092-7234

Intrado Digital Media LLC
11808 Miracle Hills Drive
Omaha, NE 68154-4403

James H. Anderson, Jr. M.D.
c/o Diabetes and Cardiometabolic Disease
Solutions Group LLC
969 Keystone Way
Carmel, IN 46032
Jefferson Street Capital LLC  46032-3000

MD Hanif
c/o BioPharma Services Inc
4000 Weston Rd,
Toronto, Ontario
M9L 3A2, Canada
Mediant Communications Inc.

Marshal Schichtman And Associates PC
1 Old Country Road Ste 360
Carle Place NY 11514-1851

Office of the US Trustee
51 S.W. 1st Ave.
Suite 1204
Miami, FL 33130-1614

Pierce Atwood LLP
Merrills Wharf
254 Commercial Street
Portland, ME 04101
Piper Sandler Companies
800 Nicollet Mall  04101-4664

Sichenzia Ross Ference
1185 Avenue of the Americas, 37th Floor
New York, NY 10036
SimpleSEC
9911 Rose Commons Drive, #E770
Huntersville, NC 28078-0323

State of Florida - Department of Revenue
Post Office Box 6668
Tallahassee, FL 32314-6668

Barry E. Mukamal
KapilaMukamal, LLP
1000 S Federal Hwy, Ste 200
Fort Lauderdale, FL 33316-1237

Marc P Barmat
www.barmattrustee.com
2255 Glades Rd Suite 419A
Boca Raton, FL 33431-7379

Travis Bird
c/o Mark D. Hildreth, Esq.
Shumaker, Loop & Kendrick, LLP
240 S. Pineapple Ave., 10th Floor
Sarasota, FL 34236-6717

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

```
(u)Beijing Youfeng Biological Technology Co L     (u)AA Advance Air, Inc              (u)Alpha Capital Anstalt
8 Yard                                            1920 N.W. 32nd St.                  LETTSTRASSE 32
Xingiong Middle Street                            Pompano Beach, FL 33064             FL-9490
Gaobeidian                                        AAA American Arbitration Ass.       VADUZ N2
                                                  120 Broadway                        American Arbitration Association
                                                  Floor 21                            120 Broadway

(u)BHP Capital NY Inc                             (u)GediWeb Solutions                (u)Nola Masterson
45 S.W. 9th Street                                4581 Weston Rd, #292                768 West California Way
Miami, FL 33130                                   Fort Lauderdale, FL 33331           Redwood City, CA 94062
BHP Capital NY, Inc.                              GH Care, Inc. DBA ALTuCELL, Inc.(   NSABP Foundation, Inc.
45 S.W. 9th Street                                561 Acorn Street                    Nova Tower 2
Attn: Bryan Pantofel, President                   Unit I                              Two Allegheny Center, Ste. 1200

(u)Patentpross                                    (u)RGN Regus                        (u)Thermo Fischer Scientific
                                                  4145 North Service Road, 2nd Floor  168 Third Avenue
                                                  Burlington, ON L7L6A3               Waltham, MA 02451
                                                  Richard D. Purcell                  Three Brothers Trading, LLC d/b/a
                                                  c/o DNA Healthlink, Inc.            Alternative Execution Group
                                                  68 White Street, Ste. 197           Attn: Richard Alter, Member

End of Label Matrix
Mailable recipients    25
Bypassed recipients     9
Total                  34
```

**EXHIBIT 1**

## EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement (the "Agreement") is entered into by and between Marc P. Barmat in his representative capacity as chapter 7 trustee for Generex Biotechnology Corp. (the "Seller" or the "Trustee") and Bio & Med Tech of the Future SPV2, LP or its designee or successor or assigns (the "Buyer").[1]

## R E C I T A L S

**WHEREAS,** on or about April 23, 2022 (the "Petition Date"), an involuntary chapter 7 bankruptcy case was filed against Generex Biotechnology Corp. (the "Debtor") the U.S. Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") in the case styled *In re Generex Biotechnology Corp.*, Case No. 22-13166-PDR (the "Case");

**WHEREAS,** on or about June 6, 2022, the Bankruptcy Court entered the "*Order for Relief in Involuntary Case and Order Setting Deadline for Filing Schedules, Statements and Other Documents*";

**WHEREAS,** on or about June 7, 2022, the Office of the U.S. Trustee filed a "*Notice Appointing Marc P. Barmat as Trustee*", which appointed Marc P. Barmat as the Chapter 7 Trustee of Debtor;

**WHEREAS,** the Debtor owns 64,153,151 common stock shares of Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology, Inc. ("NGIO") and 100,000 shares of NGIO's Series A Super Voting Preferred Stock, according to the NGIO 10-Q for quarter ending April 30, 2021;

**WHEREAS,** the Debtor owns 100% of the shares of Olaregen Therapeutix, Inc. ("Olaregen") according to the Debtor's 10-K for the fiscal year ending July 31, 2020, including 592,683 shares of Series A Preferred Stock of Olaregen representing approximately 10% voting control of Olaregen that the Trustee is aware may be subject to a lien pursuant to UCC-1 Financing Statement recorded by Creek Mountain Partners, Inc. (the "Creek Olaregen Equity"), although the Trustee cannot make any representation or warranty as to the amount or validity of the lien;

**WHEREAS,** the Buyer wishes to purchase all of the Debtor's right, title, and interest in any and all shares and stock of NGIO and Olaregen owned by Debtor (the "Equity"), on an as-is, where-is basis, with no representations or warranties except as set forth herein, for One Million Five Hundred Thousand Dollars ($1,500,000.00);

**WHEREAS,** the Equity is property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. Section 541 and the Trustee has the authority to convey the Equity to Buyer pursuant to 11 U.S.C. Section 363;

---

[1] Capitalized terms shall have the meanings ascribed to them herein, or if there is no definition herein, the meanings ascribed to them in the Bid Procedures Motion filed by the Trustee

66823669;1



**WHEREAS**, the Buyer has no connections to the Trustee. The Buyer has connections to the Debtor, as the Buyer's Manager Andrew Ro served as an officer and director for the Debtor (as of the Petition Date) and other insiders of the Buyer were in the past shareholders of Olaregen; however, neither the Buyer nor its officers, directors, management, nor insiders have any current control over the Debtor, Debtor's estate, or the Equity. The Seller and Buyer negotiated this Agreement at arm's length over several weeks of protracted negotiations over the terms incorporated into this Agreement. Accordingly, the Buyer is a good faith purchaser for value pursuant to 11 U.S.C. Section 363(m) and is entitled to receive all protections afforded pursuant to Section 363(m);

**WHEREAS**, the Trustee is aware of an alleged lien asserted by Oasis Capital, LLC recorded within ninety (90) days of the Petition Date on all of the assets of the Debtor, which lien the Trustee believes is subject to a bona fide dispute and the perfection of which the Trustee will be seeking to avoid as a preferential transfer pursuant to 11 U.S.C. Section 547. Accordingly, the Trustee seeks to sell the Equity to Buyer free and clear of such interest under 11 U.S.C. Section 363(f)(4);

**WHEREAS,** the Trustee believes that it would be in the best interest of the Estate to sell all of the Debtor's right, title, and interest in the Equity to the Buyer on an as-is, where-is basis with no representations or warranties except as set forth herein, subject to better or higher offers, contingent upon the approval of the Bankruptcy Court, and free and clear of all liens, claims and encumbrances, and interests except that the Creek Olaregen Equity shall be taken subject to assumption of any valid lien asserted by Creek Mountain Partners, Inc.

**NOW, THEREFORE**, in consideration of the foregoing and the respective covenants contained herein, the parties, intending to be legally bound, hereby agree as follows:

      1.   <u>Definitions</u>.

          "<u>Acquisition</u>" shall mean the purchase and sale of the Equity;

          "<u>Bid Procedures Motion</u>" shall mean the motion filed by the Trustee in form and substance acceptable to Buyer to convey the Equity to Buyer pursuant to the terms of the Agreement free and clear of all interests, liens, claims, and encumbrances pursuant to 11 U.S.C. Section 363 (b) and (f), which, *inter alia*, requests entry of the Equity Findings (defined below) and includes a deadline of no later than the Overbid Deadline (defined below) by which anyone objects to the sale or claiming any Liens and Interests in the Equity must assert the same or be forever barred;

          "<u>Business Day</u>" shall mean a day that is not a Saturday, Sunday, Federal holiday, or other day on which banking institutions located in the State of Florida are authorized or obligated by law to close;



"<u>Buyer</u>" shall have the meaning set forth in the Preamble;

"<u>Case</u>" shall mean that certain chapter 7 bankruptcy case styled *In re Generex Biotechnology Corp.*, Case No. 22-13166-PDR, and pending in the U.S. Bankruptcy Court for the Southern District of Florida;

"<u>Companies</u>" shall mean Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology, Inc. and Olaregen Therapeutix, Inc.;

"<u>Bankruptcy Court</u>" shall mean the U.S. Bankruptcy Court for the Southern District of Florida;

"<u>Debtor</u>" shall mean Generex Biotechnology Corp;

"<u>Effective Date</u>" shall mean the date upon which the Agreement is signed by the Parties and the First Deposit is received by the Seller;

"<u>Equity</u>" shall mean all shares, common or preferred, voting or non-voting, and rights and property interests of Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology, Inc. and Olaregen Therapeutix, Inc. that are owned by Debtor;

"<u>Equity Findings</u>" means: the factual findings solicited by Trustee and Buyer in the Bid Procedures Motion for the Bankruptcy Court to find, *inter alia*, that: (a) the Debtor owns 64,153,151 common stock shares of NGIO (and such Equity is property of the Debtor's estate); (b) The Debtor owns 100,000 shares of the Series A Super Voting Preferred Stock (and such Equity is property of the Debtor's estate); (c) there are no other classes of equity interests in NGIO; (d) the Debtor owns 100% of the outstanding common stock shares of Olaregen (and such Equity is property of the Debtor's estate); (e) there are no other classes of equity interests in Olaregen; (f) that Creek Mountain's Lien, if valid and enforceable, would attach only to common shares of Olaregen; (h) the Trustee has the authority to convey the Equity to Buyer; and (i) no other third party has any rights, interest, or equity in or to the Equity.

"<u>Estate</u>" shall mean bankruptcy estate of Generex Biotechnology Corp.;

"<u>Governmental Authority</u>" means any Federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign;

"<u>Law</u>" or "<u>Laws</u>" means any and all federal, state, and local statutes, codes, licensing requirements, ordinances, laws, rules, regulations, decrees or Orders of any foreign, federal, state or local government and any other governmental department or agency, and any judgment, decision, decree or Order of any court or governmental agency, department or authority;



"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes;

"Licenses" means licenses, permits, franchises, consents, approvals, authorizations, waivers, registrations, qualifications and certifications of any Governmental Authority that are related to the operation and management of the Companies;

"Liens and Interests" means any liens (including, without limitation, workmen's, mechanics' and materialmen's liens), liabilities, claims (secured or unsecured), security interests, charges, mortgages, deeds of trust, suits, proceedings, options, easements, trusts, restrictions, obligations or other interests, rights, or encumbrances of any kind or nature, whether accrued, absolute, contingent or otherwise;

"Order" shall mean any judgment, order, writ, injunction, ruling, stipulation, determination, award or decree of or by, or any settlement under the jurisdiction of, any court or Governmental Authority;

"Parties" means the Buyer and the Seller collectively;

"Party" means either the Buyer or the Seller;

"Person" means an individual, a partnership (general or limited), a corporation, a limited liability company, an association, a joint stock company, Governmental Authority, a business or other trust, a joint venture, any other business entity or an unincorporated organization;

"Proceeding" means any action, suit, proceeding, arbitration, claim, complaint, decree, lawsuit or any notice of violation, noncompliance or investigation;

"Records" means legal, financial, operating, technical, and other relevant data and information concerning the Companies and the Equity including but not limited to patents, intellectual property, trade secrets, and know-how, which may be redacted for personally identifiable information such as social security numbers;

"Sale Order" means an Order of the Bankruptcy Court in a form approved by the Buyer (in the Buyer's sole and absolute discretion) that, among other things: (i) authorizes the sale of the Equity to Buyer; (ii) is not be subject to any stay and is final and nonappealable; and (iii) finds that the Buyer is a good faith purchaser within the meaning of Section 363(m); (iv) makes the Equity Findings; and (v) finds that there has been no share issuance or other event causing dilution of the Equity.



"Seller" shall have the meaning set forth in the Preamble;

"Tax" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Sec. 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not;

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof; and

"Trustee" shall have the meaning set forth in the Preamble.

2.    Purchase and Sale.

A.    Acquisition. Upon the terms and subject to the conditions contained in this Agreement, on the Closing Date (as hereinafter defined) the Seller, in his capacity as the Trustee, shall sell, convey, transfer, deliver and assign to the Buyer, and the Buyer shall purchase and acquire from the Seller, all of the Seller's right, title and interest in and to the Equity free and clear of all Liens and Interests on an "as-is, where-is" basis, with no warranties or representations except as set forth herein, except that the Creek Olaregen Equity shall be taken subject to assumption of any valid lien asserted by Creek Mountain Partners, Inc. The purchase and sale of the Equity is referred to in this Agreement as the "Acquisition."

B.    Purchase Price. As consideration for the Acquisition, the total purchase price ("Purchase Price") shall be One Million Five Hundred Thousand Dollars ($1,500,000.00). The Purchase Price shall be paid by the Buyer to the Seller in cash or immediately available funds as follows:

(a)    Buyer shall pay Seller Seventy-Five Thousand Dollars ($75,000.00) within fourteen (14) days of the full execution of this Agreement (the "First Deposit"). The Deposit will be held in escrow by the Trustee and shall be released only as provided by this Agreement;

(b)    Buyer shall pay Seller Seventy-Five Thousand Dollars ($75,000.00) before the occurrence of the Overbid Deadline (the "Second Deposit"). The Deposit will be held in escrow by the Trustee and shall be released only as provided by this Agreement;

(c)    Buyer shall pay Seller One Million Three Hundred Fifty Thousand Dollars ($1,350,000.00) at Closing.



3.    Due Diligence Review Period.

A.    Due Diligence Review. The Buyer and/or its agents and/or representatives shall have through the Overbid Deadline (the "Due Diligence Review Period") to continue the review the business of, and the legal and accounting matters associated with, the Debtor, the Equity, and the Companies (the "Due Diligence Review"). The Buyer will be given access by the Trustee to Records concerning the Debtor and the Companies subject to the execution of a mutually acceptable Confidentiality and Non-Disclosure Agreement ("NDA").

B.    Buyer's Right to Terminate. Notwithstanding anything to the contrary contained in this Agreement, the obligation of the Buyer to Close under this Agreement, including its obligation to pay the Purchase Price, is subject to Buyer's satisfaction, in its sole and absolute discretion, with the results of its Due Diligence Review. At any time on or before the expiration of the Due Diligence Review Period, Buyer may elect to terminate this Agreement, by giving written notice of termination to Seller (the "Buyer Termination Notice") by any reasonable means, including email to Seller's counsel, based on Buyer's determination, in its sole and absolute discretion, that it is not satisfied with the results of its Due Diligence Review. If Buyer does not provide a Buyer Termination Notice on or before the expiration of the Due Diligence Review Period, the Buyer shall be deemed to have completed and be satisfied with the results of its Due Diligence Review. In the event that the Buyer delivers a Buyer Termination Notice to the Seller, then this Agreement shall terminate without any further liability or obligation hereunder on the part of any party, except that all obligations in the NDA shall survive the termination of this Agreement. The Seller shall return all deposits made by the Buyer within seven days after receipt of a Buyer Termination Notice.

4.    Closing and Closing Deliveries.

A.    The Closing. Unless otherwise agreed to in writing by the parties, the closing contemplated by this Agreement (the "Closing") shall take place on or before January 30, 2023, so long as the Sale Order is entered by December 30, 2022 and is not subject to any stay (the "Closing Date"). However, the Parties shall have the ability to extend Closing if mutually agreed in writing by both Parties.

B.    Closing Deliveries. In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

The Seller shall deliver to the Buyer:

(1)    Assignment, endorsement, and transfer of the Equity to Buyer by Seller effective as of the Closing Date in form and substance reasonably satisfactory to Buyer;

(2)    Any such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance



as may reasonably be requested by the Buyer to transfer the Equity to Buyer, each executed by the Seller and in form and substance satisfactory to the Buyer.

The Buyer shall deliver to the Seller the Purchase Price in cash or immediately available funds less any Deposit already delivered.

C.    Transaction Costs. Each party hereto shall pay all of its own costs and expenses incurred in connection with evaluating, negotiating, documenting and preparing for consummation of the transactions contemplated by this Agreement and the other agreements, instruments and documents contemplated hereby including attorneys' fees and costs except as to entitlement the Buyer may have to the Break-Up Fee. Without limiting the generality of the preceding sentence, the Seller shall assume and be obligates for all costs and expenses incurred in connection with obtaining an order of the Bankruptcy Court approving this Agreement and authorizing Seller to perform its obligations set forth in this Agreement, including the sale of the Equity to the Buyer pursuant to this Agreement. The parties hereto agree to use their best efforts to obtain Bankruptcy Court approval of the Sale Order, provided that the Seller shall have sole discretion as to the procedural decision making of the Bid Procedures Motion and the entry of the Sale Order, including the ability to terminate or withdraw any contested matter related to the Bid Procedures Motion and entry of the Sale Order, in which event Seller shall pay Buyer the Break-Up Fee in accordance with Paragraph 8(E).

5.    Representations and Warranties of the Seller. The Seller represents and warrants to the Buyer that the statements contained in this Section are correct and complete as of the Effective Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Effective Date). The provisions in Section 5 shall survive termination hereof or Closing:

A.    Authorization of Transactions Contemplated Under this Agreement. Seller will seek the Bankruptcy Court's approval of this Agreement and authorization of the Seller to perform his obligations hereunder and consummate the Closing. This Agreement constitutes the legally binding obligation of the Seller.

B.    Brokers. Neither the Seller nor anyone acting on behalf of the Seller has employed, either directly or indirectly, or incurred any liability to, any broker, finder or other agent in connection with this Agreement.

C.    Title. The Seller shall convey to Buyer the Equity, and shall request Bankruptcy Court approval to convey the Equity free and clear of any Liens and Interests or other restrictions on transfer, except with respect to lien asserted by Creek Mountain Partners, Inc. on 592,682 shares of Series A Preferred Shares in Olaregen owned by Debtor. Upon the consummation of the Closing, the Seller shall transfer and convey to the Buyer, and Buyer shall be vested with any title to, the Equity that Debtor owns, free and clear of any Liens and Interests or other restrictions on transfer, subject to Bankruptcy Court approval.



6.    <u>Representations and Warranties of the Buyer</u>. The Buyer represents and warrants to the Seller that the statements contained in this Section are correct and complete as of the Effective Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Effective Date). The provisions in Section 6 shall survive termination hereof or Closing.

A.    <u>Organization, Good Standing and Qualification</u>. At the Closing, the Buyer will be an entity duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation; (ii) will be duly authorized to conduct business and will be in good standing under the laws of each jurisdiction where such qualification is required and (iii) will have the has full corporate power and authority and all licenses, permits, and authorizations necessary to carry on the business in which it is engaged and to own and use the properties owned and used by it. The Buyer is not in default under or in violation of any provision of its charter or bylaws.

B.    <u>Authorization of Transactions Contemplated Under this Agreement</u>. The Buyer has the full power and authority to execute and deliver this Agreement and to perform his respective obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Buyer in accordance with its terms and conditions.

C.    <u>Legal Proceedings</u>. There are no actions, suits, litigation, or Proceedings pending or threatened against any the Buyer which could materially adversely affect such Buyer's ability to perform its obligations under this Agreement or the consummation of the transactions contemplated by this Agreement.

D.    <u>No Brokers</u>. The Buyer has not employed, either directly or indirectly, or incurred any liability to, any broker, finder or other agent in connection with the transactions contemplated by this Agreement.

E.    <u>Noncontravention</u>. The execution, delivery, compliance with and performance by the Buyer with any and all agreements and/or transactions contemplated under this Agreement and each of the other documents and/or instruments delivered in connection therewith do not and will not (to the extent applicable): (i) violate or contravene the organizational certificates, documents and agreements, as amended to date, of the Buyer, (ii) violate or contravene any Law or Order, judgment or decree to which the Buyer is subject, (iii) conflict with or result in a breach of or constitute a default by any party under any contract, agreement, instrument or other document to which the Buyer is a party or by which the Buyer or any of its assets or properties are bound or to which the Buyer or any of its assets or properties are subject.

F.    <u>Sufficient Funds</u>. Within seven days of execution of this Agreement, Buyer shall provide to the Trustee a letter that shows that the Buyer has



8

received a commitment from an investor to fund the full amount necessary to consummate this Agreement that attaches a statement reflecting that the investor has sufficient financial resources located in the United States to do so.

7.    Pre-Closing Covenants. The parties agree as follows with respect to the period between the Effective Date and the Closing:

A.    General. Each of the parties will use its best efforts to take all action and to do all things necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement.

B.    Conduct and Operation of the Business. Between the Effective Date and the Closing Date, and other than solely to the extent required to comply with applicable Law, unless the Buyer shall consent in writing, which consent shall not be unreasonably delayed, conditioned or withheld:

the Seller shall not sell, pledge, dispose of, grant, transfer, lease, license, guarantee, encumber, or authorize the sale, pledge, disposition, grant, transfer, lease, license, guarantee or encumbrance of any of the Equity. Seller shall not issue any additional equity and take any action to dilute the existing Equity subject to this Agreement.

C.    Efforts to Close. The Parties shall use all of their respective commercially reasonable efforts to perform or cause to be performed each covenant made by it and to satisfy or cause to be satisfied all conditions to the other Party's obligation to consummate the Closing as soon as practicable.

D.    Access and Information. During the Due Diligence Review Period and all times during the period prior to the Closing Date, the Seller will afford the Buyer and its agents and/or representatives access to Records and data relating to the Debtor, the Equity, and/or the Companies for the purpose of conducting a review and inspection thereof. The Seller shall use its best efforts to (i) timely furnish the Buyer with such Records as Buyer may reasonably request and (ii) otherwise cooperate and assist, to the extent requested by the Buyer, with the Buyer's investigation of the Debtor, the Equity, and/or the Companies. Nothing in this paragraph shall affect the NDA executed by Buyer in connection with access to the Records and data relating to the Debtor, the Equity, and/or the Companies, and the disclaimers of warranties and representations by the Seller therein. In connection with the Buyer's evaluation of the Acquisition, the Equity, and the Companies, the Trustee (i) disclaims all representations, warranties, or guaranties, express or implied, as to the accuracy or completeness of any Records, Proprietary Information, or any other documents or media, provided to the Buyer by the Trustee, in the Bankruptcy Case of the Debtor, or otherwise, (ii) disclaims any express or implied obligation, representation, warranty, or guaranty to provide any specific, accurate, or complete Records, Proprietary Information, or other documents or media to the Buyer in the Bankruptcy Case of the Debtor, or otherwise, (iii) disclaims all representations, warranties, and guaranties, express or implied, as to the accuracy or



completeness of any representation as to the source of any Records, Proprietary Information, documents or media provided to the Buyer by the Trustee, in the Bankruptcy Case of the Debtor, or otherwise, and (iv) disclaims all representations, warranties, and guaranties, express or implied, as to the accuracy or completeness of any description that the Trustee ascribes to the Records, Proprietary Information, documents, or media, including but not limited to by labeling of titles of documents or folders. The Buyer understands that it is wholly responsible for its own due diligence in connection with the Acquisition, and the Buyer shall indemnify and hold harmless the Trustee for any inaccuracies, omissions, or misrepresentations in the Records, Proprietary Information, the documents or media provided by the Trustee in connection with the Acquisition, in the Bankruptcy Case of the Debtor, or otherwise, and the source of such information, or the description ascribed by the Trustee to such information.

8.    Bankruptcy Case.

A.    Bankruptcy Court Filings. Until the Closing Date or the termination of this Agreement (in the absence of a Closing), the Seller shall deliver to the Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that the Seller files in the Case within a reasonable time after filing, and that such delivery may be accomplished by electronic email service on Buyer's counsel via CM/ECF in the Bankruptcy Case.

B.    Bankruptcy Court Approval. The Parties acknowledge and agree that this Agreement is not binding and cannot be performed by or enforced against Seller or Buyer unless and until the Bankruptcy Court approves this Agreement and authorizes Seller's performance of this Agreement. If the Agreement is not approved by the Court, the Seller's obligation to sell the Equity to the Buyer and Buyer's obligations shall terminate without any further liability or obligation on the part of any Party, and this Agreement shall terminate without any party having any further liability or obligation hereunder, except for Seller's obligation to refund the First and Second Deposits to the Buyer.

C.    Approval Process.

(1)    On or before October 14, 2022, Seller agrees to file the Bid Procedures Motion with the Bankruptcy Court, in a form agreeable to the Buyer, seeking approval of this Agreement and setting the Auction provided herein on or before December 27, 2022;

(2)    Seller shall request that the hearing on the Bid Procedures Motion be considered by the Bankruptcy Court on an expedited basis ("Sale Procedures Hearing");

(3)    The Seller shall request that the Bankruptcy Court enter an Order in form and substance reasonably satisfactory to the Seller and the Buyer that approves this Agreement and authorizes Seller to perform its

66823669;1



obligations under this Agreement to sell the Equity to Buyer, subject to better and higher offers, and free and clear of all liens, claims and encumbrances, except that the Creek Olaregen Equity shall be taken subject to assumption of any valid lien asserted by Creek Mountain Partners, Inc.

D.    <u>Higher and Better Offers</u>. Subject to the terms and conditions contained in Paragraph 8(E), the Buyer acknowledges and agrees that this Agreement is subject to higher or better offers for the Equity which may be solicited by and/or received by the Seller through an auction. The Buyer shall have the right and opportunity, but not the obligation, to make one (1) or more competitive bids at an auction to be held on or before December 27, 2022 (the "Auction"). If the Buyer's bid is not accepted and approved by the Bankruptcy Court, the Seller's obligation to sell the Equity to the Buyer shall terminate without any further liability or obligation on the part of any Party, and this Agreement shall terminate without any party having any further liability or obligation hereunder, except for Seller's obligation to refund the First and Second Deposits to the Buyer, and to pay the Break-Up Fee if and to the extent approved by the Bankruptcy Court.

E.    <u>Break Up Fee</u>. In the event that the Bankruptcy Court approves a higher or better offer for the purchase of the Equity from a Person other than the Buyer or any Person directly or indirectly Affiliated with or otherwise related to the Buyer or any nominee thereof, and the Seller closes a sale transaction with that other buyer, then the Buyer shall be paid upon from the proceeds of the sale of the Equity to such other Person the sum of Fifty Thousand Dollars ($50,000.00) (the "Break-Up Fee"), subject to the approval of the Bankruptcy Court.

F.    <u>Subsequent Bidding Terms</u>. In the event that the Seller desires and/or is required to seek additional bids (each an "Additional Bid") for the Equity, then the parties agree as follows:

1.    The Seller will only consider and/or accept Additional Bids from the Buyer or from a "Qualifying Bidder" (as defined hereinafter). For purposes of this Agreement, a Qualifying Bidder shall be defined as a bidder that has made a Qualifying Bid (as defined hereinafter) on or before the deadline to submit such Qualifying Bid, which deadline shall be no later December 23, 2022 at 5 p.m. EST (the "Overbid Deadline").

2.    For purposes of this Agreement, a "Qualifying Bid" is defined as: a written offer that (i) provides that the bidder shall purchase the Equity on terms which, in the business judgment of the Seller, are no less favorable to the Estate than those contained in this Agreement and/or any Additional Bid from the Buyer; (ii) does not provide and/or entitle any such bidder to any transaction or break-up fee, expense reimbursement, termination, or similar type of fee or payment; (iii) does not contain any due diligence, financing or regulatory contingencies of any kind; (iv) is at least Two Hundred Thousand



dollars ($200,000.00) (the "Minimum Overbid") higher than the Purchase Price or One Million Seven Hundred Thousand dollars ($1,700,000.00) (the "Minimum Bid Increment") higher than the most recent highest bid contained in any subsequent Qualifying Bid; (v) contains such financial disclosures and documentation which demonstrate, in the Trustee's sole business judgment, the potential bidder's financial and other capabilities to consummate the Additional Bid; and (vi) fully discloses the identity of each person and/or entity that is bidding for the Equity or otherwise participating in connection with such bid and the complete terms of any such participation. Within 24 hours after the Overbid Deadline, the Trustee shall notify the Buyer of all Qualifying Bids that the Trustee has received, along with a copy of each such Qualifying Bid.

        3.     Notwithstanding anything to the contrary contained herein, any Additional Bid from the Buyer shall not be subject to the Minimum Overbid condition referenced herein.

        9.     <u>Conditions Precedent to the Closing of the Agreement</u>.

        A.    <u>Conditions Precedent to Buyer's Obligations</u>. The obligations of Buyer under this Agreement are subject to the satisfaction of the following conditions on or prior to the Closing Date, all or any of which may be waived in writing by Buyer:

        (1)    The Agreement has not been terminated by the Buyer pursuant to its rights under this Agreement.

        (2)    The Seller shall have delivered all documents required to sell, convey, transfer, deliver and assign to the Buyer the Equity, and all such documents shall have been properly executed by the Seller.

        (3)    The Seller shall be able to sell, convey, transfer, deliver and assign to the Buyer the Equity free and clear of any and all liens, claims, and encumbrances, except that the Creek Olaregen Equity shall be taken subject to any valid lien asserted by Creek Mountain Partners, Inc.

        (4)    The Court shall have entered the Sale Order in a form approved by the Buyer (in the Buyer's sole and absolute discretion) that, among other things: (i) authorizes the sale of the Equity to Buyer; (ii) is not be subject to any stay and is final and non appealable; and (iii) finds that the Buyer is a good faith purchaser within the meaning of Section 363(m); (iv) makes the Equity Findings; and (v) finds that there has been no share issuance or other event causing dilution of the Equity.

        B.    <u>Conditions Precedent to Seller's Obligations</u>. The obligations of the Seller under this Agreement are subject to the satisfaction of the



following conditions on or prior to the Closing Date, all or any of which may be waived in writing by the Seller

(1)    The Buyer shall have delivered to the Seller all documents required to be delivered by the Buyer, and all such documents shall have been properly executed by the Buyer.

(2)    The Buyer shall have tendered the Purchase Price in accordance with the terms set forth in this Agreement.

(3)    The Bankruptcy Court shall have entered the Sale Order authorizing the sale of the Equity to Buyer and it shall not be subject to any stay.

10.    <u>Termination</u>.

A.    <u>Termination by the Buyer</u>. This Agreement may be terminated and the transactions contemplated hereby abandoned by the Buyer as follows:

(1)    on or before the expiration of the Due Diligence Review Period by delivering a Buyer Termination Notice in accordance with Paragraph 3., which notice shall be effective as of the date of the delivery of said notice;

(2)    in accordance with Paragraph 8(B) if the Bankruptcy Court does not approve this Agreement; or

(3)    in accordance with Paragraph 8(D), if a better and higher bid is received by the Seller through the Auction and approved by the Bankruptcy Court, and either (i) the Buyer is not the Back-Up Bidder, or (ii) the Buyer is the Back-Up Bidder but the Equity is sold to the Successful Bidder. All capitalized terms in this paragraph not defined in this Agreement shall have the meanings ascribed in the Bid Procedures Motion.

B.    <u>Termination by the Seller</u>. This Agreement may be terminated and the transactions contemplated hereby abandoned by the Seller as follows:

(1) in accordance with Paragraph 8(B) if the Bankruptcy Court does not approve of this Agreement;

(2) in accordance with Paragraph 8(D), if a better and higher bid is received by the Seller through the Auction and approved by the Bankruptcy Court, and either (i) the Buyer is not the Back-Up Bidder, or (ii) the Buyer is the Back-Up Bidder but the Equity is sold to the Successful Bidder; or

(3) if the Buyer does not tendered the full Purchase Price in accordance with the terms set forth in this Agreement by the Closing Date.



66823669;1

C.    <u>Effect of a Termination</u>. In the event this Agreement is terminated according to the terms of this Agreement, the Seller will refund the First and Second Deposits to the Buyer within seven (7) days of the termination and, if applicable, pay the Break-Up Fee under Paragraph 8(E), and the Seller and the Buyer (and their respective representatives, agents, officers, directors, employees and Affiliates) shall have no further liability or obligation whatsoever under this Agreement; however, notwithstanding the foregoing and/or anything to the contrary contained in this Agreement.

11.    <u>Certain Covenants Regarding Information</u>.

<u>Post-Closing Access to Information</u>. After the Closing, the Seller shall provide the Buyer with such information, and access during normal business hours to such Records as the Buyer may reasonably request from time to time in order to consummate the purchase of the Equity and assume operations of the Companies.

12.    <u>Miscellaneous</u>.

A.    <u>Amendments and Waivers</u>. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

B.    <u>Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.

C.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

D.    <u>Entire Agreement</u> This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the parties, written or oral, to the extent they related in any way to the subject matter hereof.



66823669;1

F.    <u>Facsimile / Electronic Execution</u>. Signatures on counterparts of this Agreement transmitted by facsimile or by electronic means are hereby authorized and shall be acknowledged as if any such signature included on any such counterpart and so transmitted was an original execution.

G.    <u>Governing Law and Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida. The Parties agree that any claim, dispute or controversy arising from or related to this Agreement shall be submitted to the Bankruptcy Court, which shall retain jurisdiction over same.

H.    <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

I.    <u>Incorporation of Exhibits and Schedules</u>. Any Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

J.    <u>No Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any party hereto without the prior written consent of the other parties; provided, however, the foregoing shall not prohibit Buyer from assigning its rights, interests and/or obligations under this Agreement to an affiliate or new entity formed to hold the Equity.

K.    <u>Binding on Successors, Assigns and Others</u>. This Agreement and the covenants and conditions contained herein shall apply to, be binding upon, and inure to the heirs, executors, administrators, conservators, trustees, agents, legal representatives, successors, transferees, and assigns of the Parties hereto including, but not limited to, any subsequent committee, bankruptcy trustee, plan administrator, or liquidating trustee.

L.    <u>Advice of Counsel</u>. The Parties acknowledge that they have been (or have had the opportunity to be) represented by counsel of their own choice in the negotiations leading up to the execution of this Agreement and that they have read this Agreement and have had the opportunity to receive an explanation from legal counsel regarding the legal nature and effect of this Agreement, and each Party understands the terms and provisions of this Agreement and its nature and effect. Each Party further represents that they are entering into this Agreement freely and voluntarily, relying solely upon the advice of their own counsel if applicable, and not relying on representation of any other Party or of counsel for any other Party.

M.    <u>Attorneys' Fees and Costs</u>. The Parties understand and agree that each Party shall bear its own respective attorneys' fees and costs in connection with this



Agreement.

        N.    <u>No Third-Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

        O.    <u>Notices</u>. All notices, requests, demands, claims, and other communications hereunder shall be in writing. Any party may send any notice, request, demand, claim, or other communication hereunder to the intended recipient at the address set forth below using registered or certified mail, return receipt requested, postage prepaid, personal delivery or recognized overnight delivery service and such notice, request, demand, claim, or other communication shall be deemed to have been duly given three (3) days after mailing if sent by registered or certified mail, on the day same is provided to the party undertaking personal delivery, provided that such party provides an acknowledgment of the delivery thereof at the address indicated thereon, and on the same day after same is provided to the recognized overnight delivery service, provided that such party receives an acknowledgment of the delivery thereof at the address indicated thereon and on the day same is transmitted. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other parties notice in the manner herein set forth. The addresses of the parties are as set forth below:

If to the Buyer:        Bio & Med Tech of the Future SPV2, LP
                              Attn: Jan Meijer, General Partner
                              320 East 58 Street
                              9C
                              New York, NY 10022

With a Copy to:        Michael Lessne
                              Lessne Law
                              100 SE 3rd Ave, 10th Floor
                              Fort Lauderdale, FL 33394
                              T: (954) 372-5759
                              E: michael@lessne.law

                              and

                              Andrew Layden
                              Baker Hostetler LLP
                              200 South Orange Avenue, Suite 2300
                              Orlando, FL 32801
                              T: (407) 649-4000
                              E: alayden@bakerlaw.com



If to Seller:      Marc P. Barmat
           Chapter 7 Trustee
           2255 Glades Road, Suite 419A
           Boca Raton, FL 33431
           T: (561) 395-0500
           E: mbarmat@furrcohen.com

With a Copy to:     Eyal Berger
           Akerman
           201 East Las Olas Boulevard, Suite 1800
           Fort Lauderdale, FL 33301
           T: (954) 712-6071
           E: eyal.berger@akerman.com

    P.   Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

**[SIGNATURE PAGE TO FOLLOW]**

66823669;1



IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**SELLER**

By: _____

Marc P. Barmat
Chapter 7 Trustee

**BUYER**

By: _____

TGK Management LLC, General Partner
Name: Kristofer Lacarrere, granted temporary Power of Attorney from Jan Meijer
Position: Managing Member

18

66823669;1

**EXHIBIT 2**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Fort Lauderdale Division**
www.flsb.uscourts.gov

In re:                                                             Chapter 7

GENEREX BIOTECHNOLOGY CORP,                 Case No. 22-13166-PDR

       Debtor.

_____/

**ORDER (I) APPROVING STALKING HORSE BID AND STALKING HORSE EPA,**
**(II) APPROVING BID PROCEDURES AND BID PROTECTIONS IN CONNECTION**
**WITH THE SALE OF DEBTOR'S EQUITY IN TWO SUBSIDIARIES,**
**(III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE,**
**(IV) SCHEDULING AN AUCTION AND SALE HEARING AND**
**(V) APPROVING THE SALE OF**
**THE EQUITY FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES**

THIS MATTER came before the Court for hearing on _____, upon the motion (the

"Motion") (ECF No.___) of Marc Barmat, Chapter 7 Trustee ("Trustee") of Generex

Biotechnology Corp. (the "Debtor") seeking the entry of an order (I) approving Stalking Horse

Bid and Stalking Horse EPA, (II) approving bid procedures and bid protections in connection

with the sale of Debtor's equity in two entities, (III) approving the form and manner of notice of

sale, (IV) scheduling an auction and sale hearing, and (V) approving the sale of the equity free

and clear of all liens, claims, encumbrances, and interests of any kind, including without limitation any right anyone may have to the Equity (as defined below), specifically including any right to claw back equity pursuant to contract or other restrictions on transfer, except that any buyer will take the Creek Olaregen Equity, subject to any valid lien asserted by Creek Mountain Partners, Inc. ("Creek Mountain").  The Court, having reviewed the Motion, the Appendix (ECF No. ___), having heard arguments of counsel, and being otherwise fully advised in the premises, hereby:

**FINDS AND DETERMINES THAT**:

A.      The Court has jurisdiction over this matter and over the property of the Debtor pursuant to 28 U.S.C. §§ 157(a) and 1334, venue is proper in this district pursuant to 28 U.S.C. § 1408, and this is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      Good and sufficient notice of the relief sought in the Motion has been given in accordance with Bankruptcy Rule 2002, and no other or further notice is or shall be required.  A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all parties-in-interest.

C.      The sale procedures set forth herein (the "Sale Procedures") and proposed notice of the sale set forth in the Motion are appropriate, and reasonably calculated to provide all interested parties with timely and proper notice thereof.

D.      The Sale Procedures set forth herein are fair, reasonable, and appropriate, and are designed to maximize the recovery on the proposed sale of the Equity.[1]

E.      The bidding and sale process described in the Motion is fair and reasonable, and designed to fully expose the Equity to the market.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed in the Stalking Horse EPA, or if there is no definition therein, the meanings ascribed in the Motion.

F.      As set forth in the Motion, the Equity is property of the Debtor's bankruptcy estate.

G.      The Court makes the following factual findings with respect to Olaregen Therapeutix, Inc. ("Olaregen"):

      i.      Olaregen has 6,236,390 common stock shares outstanding and no preferred or other classes of equity interests;

      ii.     Debtor owns 6,236,390 shares of Olaregen's common stock, representing 100% of the outstanding shares of Olaregen;

      iii.    Debtor's 100% ownership of Olaregen stock is property of the bankruptcy estate and the Trustee has authority to convey the Olaregen stock to the Buyer;

      iv.     Creek Mountain's Lien, if valid and enforceable, would attach only to 592,683 common shares of Olaregen;

      v.      no other person or entity has any rights, interest, or equity in the shares of Olaregen; and

      vi.     there has been no share issuance or other event causing dilution of Debtor's equity in Olaregen.

H.      The Court makes the following factual findings with respect to Antigen Express, Inc. d/b/a NuGenerex Immuno-Oncology, Inc. ("NGIO"):

      i.      NGIO has 100,300,000 common stock shares outstanding, and the Debtor owns 64,153,151 of such common stock shares of NGIO;

      ii.     NGIO has 100,000 Series A Super Voting Preferred Stock outstanding, and the Debtor owns all 100,000 shares of such Series A Super Voting Preferred Stock;

      iii.    there are no other classes of equity interests in NGIO;

       iv.      Debtor's equity in NGIO is property of the bankruptcy estate and the Trustee has authority to convey the NGIO stock to the Buyer;

       v.      no other person or entity has any rights, interest, or equity in the Debtor's shares of NGIO; and

       vi.      there has been no share issuance or other event causing dilution of Debtor's equity in NGIO.

I.      The Stalking Horse Bid was proposed and entered into by the Trustee and the Stalking Horse Bidder without collusion, in good faith, and from arm's length bargaining positions. The Stalking Horse Bidder is a purchaser in good faith under 11 U.S.C. § 363(m) and, as such, is entitled to the protections afforded thereby.

J.      Pursuant to 11 U.S.C. § 105, it is necessary and appropriate to issue an injunction against further issuance of additional equity or taking any actions to dilute the existing Equity.

K.      The entry of this Order is in the best interests of the Debtor's estate, creditors and all other parties-in-interest.

**ORDERS AND ADJUDGES THAT**:

1.      The Motion is **GRANTED** as set forth herein.

2.      The Sale Procedures set forth herein are hereby **APPROVED**.

3.      The Trustee is hereby **AUTHORIZED** to consummate and carry out the actions reasonably necessary to consummate and carry out the Sale Procedures and Auction.

4.      The form of the equity purchase agreement ("EPA") filed by the Trustee and annexed to the Motion (ECF No. ___) is approved, subject to the terms of the sale procedures set forth herein.

66655457;1

5.      The findings and conclusions set forth above constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

6.      The Sale Procedures with respect to the Auction and the sale of the Equity are as follows:

     i.      Participation Requirements:  Unless otherwise ordered by the Court, in order to participate in the bidding process, an interested bidder must:

         (1)      Wire into the trust account of the Trustee an escrow deposit of Two Hundred Thousand Dollars ($200,000.00) so that the wire is confirmed to be received by the Trustee through a balance verification of the Trustee's trust account **no later than 5:00 p.m. EST on December 23, 2022** (the "Bid Deadline");

         (2)      Submit to the Trustee and Akerman LLP on or before the Bid Deadline: (A) a fully executed equity purchase agreement ("EPA") substantially in the form of the EPA to be provided by the Trustee (the effectiveness of such EPA being contingent only upon the Qualified Bidder becoming the Successful Bidder pursuant to these procedures, subject only to Bankruptcy Court approval, with no due diligence or financing contingencies), with a purchase price of not less than One Million Seven Hundred Thousand Dollars ($1,700,000.00), and (B) a black-lined version of the EPA to show any changes made by such bidder; provided that, an EPA with any material changes may be rejected by the Trustee in its sole business judgment; and

         (3)      Submit to Akerman and the Trustee on or before the Bid Deadline such financial disclosures and documentation which demonstrate, in the Trustee's sole business judgment, the potential bidder's financial and other capabilities to consummate the sale.

     ii.      A person who timely complies with these Participation Requirements shall have submitted a "Qualified Bid" and shall be deemed a "Qualified Bidder."  The list of Qualified Bidders will not be shared with anyone prior to the Auction except the Stalking Horse Bidder.  The Stalking Horse Bidder shall be deemed a Qualified Bidder.

     iii.      Waiver of Conflicts:  Any person who has submitted a Qualified Bid shall be deemed to have waived any right to claim there is a conflict with respect to an unrelated transaction for which such person has employed the law firm of Akerman LLP, or Furr Cohen, P.A., and the Trustee's employment of Eyal Berger, Esq. and the law firm of Akerman LLP as counsel for the sale of the Equity and related transactions contemplated therein.

iv.   Deadline to Object: The deadline to object to the Stalking Horse Bid and sale procedures is **December 16, 2022**.

v.   Auction:   In the event the Trustee receives a timely Qualified Bid, the Trustee will conduct an auction (the "Auction"). The Auction shall take place on **December 27, 2022 beginning at 9:30 a.m.** via Zoom videoconferencing, or such other time or place as the Trustee shall notify the Qualified Bidders. In the event the Trustee does not receive a timely Qualified Bid, the Trustee will seek final approval of the sale to the Stalking Horse bidder at the Sale Hearing.

vi.   Auction Procedures:   At the Auction, the Trustee will identify the Qualified Bid which shall serve as the opening bid.

> (1)   All Qualified Bidders shall be entitled to make any subsequent bids in increments of not less than $50,000.00 (a "Subsequent Bid"). Bidding at the Auction shall continue until such time as the highest or best offer is determined by the Trustee in the exercise of his sole business judgment. The Trustee reserves the right to modify the bidding increments or announce at the Auction additional procedural rules for conducting the Auction in his sole business judgment.

> (2)   Each Qualified Bidder's offer shall be irrevocable until the selection of the Successful Bidder and, if applicable, the Back-Up Bidder (as set forth in the EPA), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the sale to the Successful Bidder or the Back-Up Bidder.

vii.   Broker's Commissions: The bankruptcy estate shall not be liable for any broker commissions.

viii.   Successful Bid:  After the conclusion of the Auction, the Trustee shall submit the highest or best bid that has been accepted (the "Successful Bid") for approval by the Bankruptcy Court at a hearing at the United States Courthouse, 299 E. Broward Blvd, Courtroom 301, Fort Lauderdale, FL  33301 on **December 27, 2022 at 2:30 p.m.** EST following the auction (the "Sale Hearing"). The Qualified Bidder who has the Successful Bid presented for approval to the Court shall be referred to as the "Successful Bidder."

ix.   Closing Date:   The closing of the transaction (the "Closing") shall take place on or before January 30, 2023, so long Sale Order is entered by December 30, 2022 and is not subject to any stay (the "Closing Date"), subject to the terms of the EPA. The Successful Bidder must be prepared and must in fact consummate the purchase of the Equity in accordance with the EPA.

x.   Back Up Bid:  Upon the failure of the Successful Bidder to consummate the closing of the purchase of the Equity because of a breach or failure on the part of the Successful Bidder, then the Trustee may elect in his business judgment to

close with the next highest or otherwise best Qualified Bidder to be the Successful Bidder (the "Back Up Bidder"). At the Sale Hearing, the Trustee intends to seek approval from the Court for the next highest or best bid (the "Back Up Bid"), which approval shall authorize the Trustee to consummate the Back Up Bid immediately after a default under the Successful Bid without further order of the Court. Promptly following the conclusion of the Sale Hearing, the Trustee shall return the deposits to each unsuccessful Qualified Bidder (except the Back Up Bidder whose deposit shall either be returned upon the closing of the sale to the Successful Bidder or applied to the purchase price in a closing with such Back Up Bidder).

    xi.   <u>As is/where is</u>: The Equity will be sold "as is", "where is", with all faults, with no guarantees or warranties, express or implied.

    xii.   <u>Credit Bidding</u>: Only holders of allowed valid secured claims (that are otherwise Qualified Bidders) are permitted to credit bid at the Auction; provided that, in the event any person submits a permitted credit bid and is the Successful Bidder and/or Back Up Bidder, such person shall provide for the payment of the Break-Up Fee, in cash on the Closing Date. No party shall be permitted or entitled to credit bid, or attempt to credit bid, any alleged obligation of the Debtor that the Trustee asserts constitutes, or will constitute at some point, a contingent, unliquidated or disputed claim against the Debtor. The Trustee reserves all rights to contest the propriety of any credit bid pursuant to § 363(k) & § 105 of the Bankruptcy Code.

7.      The Trustee is authorized to act in accordance with the Sale Procedures, which shall be binding upon all parties-in-interest in this case.

8.      The Equity Purchase Agreement (the "Stalking Horse EPA") entered into between the Trustee and Bio & Med Tech of the Future SPV2, LP (the "Stalking Horse Bidder") is approved, subject to the Sale Hearing and entry of the Sale Order.

9.      The Break-Up Fee in the amount of Fifty Thousand and No/100 Dollars ($50,000.00) set forth in the Stalking Horse EPA is approved as set forth therein.

10.    The Overbid Protection set forth in the Stalking Horse EPA is approved, and if the Stalking Horse Bidder has not terminated or materially breached the Stalking Horse EPA, the Trustee agrees not to accept any offers from an alternative Buyer unless such offer is at least One Million Seven Hundred Thousand Dollars ($1,700,000.00).

11.     Prior to the Sale, all persons and entities are enjoined from issuance of additional

equity in NGIO or Olaregen, or taking any actions to dilute the existing Equity.

12.     The Trustee is authorized and permitted to sell the Equity to the highest or best

bidder following the Auction, free and clear of any liens (including, without limitation,

workmen's, mechanics' and materialmen's liens), liabilities, claims (secured or unsecured),

security interests, charges, mortgages, deeds of trust, suits, proceedings, options, easements,

trusts, restrictions, obligations or other interests, rights, or encumbrances of any kind or nature,

whether accrued, absolute, contingent or otherwise, or other restrictions on transfer, except with

respect to lien asserted by Creek Mountain on 592,682 shares of Series A Preferred Shares in

Olaregen owned by Debtor.   The purchaser of the Equity will take the Equity subject only to any

valid lien asserted by Creek Mountain.   The Liens and Interests, except any lien or interest of

Creek Mountain, shall attach to the proceeds of the sale of the Equity in the order of their

priority, with the validity, force and effect that they had as of the Petition Date, if any, against the

Equity, subject to the rights, claims, defenses and objections of the Trustee and all interested

parties with respect to such liens, so that the purchaser of the Equity shall take the Equity free of

all the Liens and Interests.

13.     The Auction will be held on **December 27, 2022 at 10:00 a.m.** via Zoom

videoconferencing, or such other time or place as the Trustee shall notify the Qualified Bidders.

The Auction may be adjourned or rescheduled without notice other than by an announcement of

such adjournment at the Auction.

14.     The Sale Hearing to consider final approval of the sale of the Equity will be held

immediately following the Auction on **December 27, 2022 at 2:30 p.m.** at the United States

Bankruptcy Court, United States Courthouse, 299 E. Broward Blvd., Courtroom 301, Fort

Lauderdale, FL 33301.  The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of such adjournment at the Sale Hearing.

15.    Objections, if any, to the proposed sale, must: a) be in writing, b) set forth the nature of the objector's claims against or interest in the Debtor's estate, and the basis for the objection and the specific grounds therefore; c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of Florida and all Orders of this Court; d) be filed with the Court and served upon the Trustee, the Debtor, the Stalking Horse Bidder, and the United States Trustee for the Southern District of Florida, so as to be received no later than **December 16, 2022** (the "Objection Deadline"). Only timely filed and served responses and objections will be considered by the Court during the Sale Hearing. The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the proposed sale or the consummation and performance with respect to the proposed sale.

16.    The Trustee has served the Motion on the Debtor, all creditors scheduled on the creditor matrix, all creditors who have filed proofs of claim, the Office of the United States Trustee, and on the registered agent and corporate management of NGIO and Olaregen.  The Trustee shall serve this Order upon the Debtor, all creditors scheduled on the creditor matrix, all creditors who have filed proofs of claim, the Office of the United States Trustee and on the registered agent and corporate management of NGIO and Olaregen.  The foregoing form and manner of notice of the Auction and proposed sale is approved.

17.    The Trustee will publish notice of the proposed sale free and clear of all Liens and Interests pursuant to Section 363(f) of the Bankruptcy Code, except as otherwise provided herein, with such Liens and Interests attaching to the sale proceeds, in the *Wall Street Journal*

not less than once per week for two consecutive weeks. Such publication notice will set forth the time, date and place of the Auction and Sale Hearing.

18.     Notice of the Sale Procedures, the Auction, the Sale Hearing and the remainder of the relief requested in the Motion, as described in the Motion, shall be good and sufficient notice thereof, and any requirements for other or further notice shall be waived and dispensed with pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9007 and pursuant to the Court's powers under section 105 of the Bankruptcy Code.

19.     Any stays that may be imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure with respect to the Motion are waived.

20.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

# # #

Submitted by:

Eyal Berger, Esq.
Florida Bar No.: 011069
Email: eyal.berger@akerman.com
AKERMAN LLP
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301-2999
Tel: 954-463-2700
Fax: 954-463-2224

*Attorney Berger is directed to serve a conformed copy of this order on all interested parties.*